**SECURITIES AND EXCHANGE COMMISSION, Appellee**

v.

**Jack LAVIN and Robin Lavin, Appellants**

No. 96–5286.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 14, 1997.

Decided May 2, 1997.

Bruce Birenboim, New York City, argued the cause for appellants, with whom Leslie Gordon Fagen and William C. Silverman were on the briefs.

Ross A. Albert, Special Counsel, Securities and Exchange Commission, Baltimore, MD, argued the cause for appellee, with whom Paul Gonson, Solicitor, Richard H. Walker, General Counsel, and Eric Summergrad, Principal Assistant General Counsel, were on the brief. Jacob H. Stillman, Associate General Counsel, Washington, DC, entered an appearance.

Before: WALD, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge.

Appellants Jack and Robin Lavin appeal from an order enforcing a subpoena for seven taped telephone conversations that they maintain are protected from disclosure by the privilege for confidential marital communications. The district court rejected the Lavins' claim of privilege, finding that their communications were not confidential and that, even if initially confidential, the Lavins waived the right to assert the privilege. The Lavins contend that the district court's finding that their conversations were not confidential was unsupported by the evidence, and that the district court erred in denying their request for discovery on the disputed issue of the confidentiality of their conversations. The Lavins also contend that the district court's finding of waiver of the privilege was erroneous as a matter of law insofar as the court based its conclusion on their failure to secure physical possession of all copies of their taped conversations and on the inclusion in their pleadings of an excerpt from the conversations. We hold that because the record was insufficiently developed to determine whether the communications were confidential, the district court erred in limiting discovery on the issue of confidentiality. We also hold that the Lavins took all reasonable steps to protect the confidentiality of their conversations, and thus did not waive the right to assert the privilege. Accordingly, we reverse and remand the case to the district court to permit the Lavins discovery.

## I.

On June 30, 1995, the Securities and Exchange Commission ("SEC") issued a subpoena duces tecum to Mr. Lavin as part of its ongoing investigation, commenced in June 1994, into fraudulent sales practices in derivative securities at Bankers Trust Company ("Bankers Trust" or "the bank") and BT Securities Corporation ("BT Securities"), a broker-dealer registered with the SEC.[1] The subpoena sought production of tape recordings of seven conversations that Mr. Lavin had with his wife from mid-June to mid-July 1994. By the time it sought the Lavins' conversations, the SEC had already obtained from the bank over 5,000 tape-recorded conversations of bank employees involved in selling derivatives. In December 1994, the SEC reached a settlement with the bank but continued its investigation of certain BT Securities employees.

At the time of the conversations, Mr. Lavin was a managing director of BT Securities and head of its U.S. Corporate Capital Markets Group, which sold derivatives to corporate customers, and was head of BT Securities' Chicago office. Until January 1994, Mr. Lavin had worked at BT Securities' main office in New York. There, he had a desk on a trading floor, and, consistent with the New York office's policy, the telephone on his trading desk was taped. He also shared a personal office in New York and conversations on his office telephone were not taped.

Before Mr. Lavin's appointment in January 1994 as head of the BT Securities' Chicago office, that office dealt primarily in corporate financings and did not have a taping system for its telephone calls. With the arrival of Lavin's derivatives group, Mr. Lavin decided that the Chicago office should have a system for the routine taping of tele-

1. Bankers Trust and BT Securities are wholly-owned subsidiaries of Bankers Trust New York Corporation.

phone calls with its customers. The taping system was put in place between February and April 1994, and it recorded the seven conversations between Mr. and Mrs. Lavin. Whether Mr. Lavin had originally arranged for the telephones of all three persons engaged in selling derivatives, including himself, to be recorded, or whether he had requested all those lines except his private line in his office to be recorded was in dispute. Mr. Lavin claimed the latter instruction was the one he gave, and testified that as soon as he became aware of the tape recording of the conversations on his private line, he ordered the taping stopped. It is undisputed that by September 2, 1994, pursuant to Mr. Lavin's instructions, the tape recording of his private office line had ceased.

In mid-November 1994, Mr. Lavin's counsel was notified by Bankers' Trust's counsel that copies of the tapes of the Lavins' seven conversations had been provided as part of a production of several thousand tapes earlier that month to the Federal Reserve Bank of New York in response to a request made pursuant to the Federal Reserve's examination powers.[2] Mr. Lavin's counsel immediately alerted Bankers Trust and its counsel that the Lavins were asserting the confidential marital communications privilege as to the conversations between Mr. and Mrs. Lavin, and requested that the bank take all steps necessary to preserve the privilege. Consistent with this request, Bankers Trust asserted the marital privilege to the Federal Reserve on behalf of the Lavins as part of a privilege list on which Bankers Trust asserted its own privileges with respect to the thousands of tapes provided to the Federal Reserve. The Lavins also secured an agreement with Bankers Trust that it would provide them with notice and an opportunity to seek judicial relief prior to any further disclosure of the tapes. Thereafter, in January 1995, the Lavins formally requested that Bankers Trust return all copies of the tapes to the Lavins; the bank denied the request on the grounds that there were outstanding document requests and subpoenas for the production of the tapes, but confirmed its intention to abide by its agreement with the Lavins.

In January 1995, the SEC learned that Bankers Trust had withheld production of the seven Lavin tapes from previously produced materials because of the Lavins' claim of privilege. Four months later, the SEC deposed Mr. Lavin on the circumstances surrounding the making of the tapes, and also conducted four *ex parte* investigatory depositions of BT Securities personnel. After the Lavins denied its renewed request for the tapes, the SEC served a subpoena on Mr. Lavin for production of the tapes.[3] Following the Lavins' formal objection to production on the ground of the confidential marital communications privilege, the SEC, on November 9, 1995, applied to the district court for an order enforcing its subpoena, and Mrs. Lavin intervened in the proceeding.

Meanwhile, the issue of the Lavins' privilege also arose in a civil suit brought against Bankers Trust and BT Securities by one of their derivatives customers. *See Procter & Gamble Co. v. Bankers Trust Co.,* 909 F.Supp. 525 (S.D.Ohio 1995). In October 1995, Procter & Gamble sought to compel the bank to produce the Lavins' taped conversations. After the bank, which asserted the confidential marital communications privilege on the Lavins' behalf, refused to produce the tapes, the Lavins intervened to assert their privilege claim. The Lavins contend that although the SEC was not a party to the proceedings, the district court's denial of Proctor & Gamble's motion was based upon a record identical in all relevant respects to that in the instant case. *Id.* at 526. The court found that neither Mr. nor Mrs. Lavin was aware that their conversations were being recorded, *id.* at 527, and without reaching the question of whether Mr. Lavin waived the privilege, the court concluded that Procter & Gamble made no showing that Mrs. Lavin had done so. *Id.* at 528. Ruling that even if one spouse desires to disclose confi-

2. · *See* 12 U.S.C. § 325.

3. The SEC and the Lavins agreed that the tapes would be deemed to be in Mr. Lavin's possession, custody, and control for purposes of his response to the subpoena. The SEC sought to litigate the privilege issue without having to proceed directly against the bank.

dential marital communications without the consent of the other spouse, the privilege can still be asserted by the non-waiving spouse, the court affirmed the Lavins' assertion of the privilege. *Id.*

Subsequently, the district court here ordered the SEC's subpoena to be enforced. *SEC v. Lavin,* 937 F.Supp. 23 (D.D.C.1996). The court found that because Mr. Lavin knew or should have known that his telephone conversations were being recorded, "the conversations at issue did not take place in a confidential setting and, therefore, the confidential marital communications privilege does not attach." *Id.* at 25. Alternatively, assuming the privilege did attach, the district court found that the Lavins' conduct demonstrated that they had waived the privilege. *Id.* at 30–32. The Lavins appeal.

## II.

 The federal common law recognizes two types of marital privileges: the privilege against adverse spousal testimony and the confidential marital communications privilege. The former allows a spouse called as a witness against his or her spouse in a criminal proceeding to refuse to testify, *see Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 913–14, 63 L.Ed.2d 186 (1980), and the latter protects from disclosure private communications between the spouses in the confidence of the marital relationship. *See Blau v. United States,* 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951); *Wolfle v. United States,* 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934). Noting the evolutionary development of testimonial privileges, the Supreme Court in *Trammel* expressed doubt about the continued vitality of the justifications for the privilege against adverse spousal testimony and limited the circumstances under which it may be invoked. 445 U.S. at 47–53, 100 S.Ct. at 910–14. By contrast, the Court reaffirmed the significance of the confidential marital communications privilege and its important role in protecting the marital relationship, " 'the best solace of human existence.' " *Id.* at 51, 100 S.Ct. at 913 (quoting *Stein v. Bowman,* 38 U.S. (13 Pet.) 209, 220–23, 10 L.Ed. 129 184, 194–97 (1839)); *see also* 2 JACK B. WEINSTEIN ET AL., WEIN-

STEIN'S EVIDENCE ¶ 505[04] (1996). As the Supreme Court observed on an earlier occasion, "[t]he basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of the justice which the privilege entails." *Wolfle,* 291 U.S. at 14, 54 S.Ct. at 280.

 The confidential marital communications privilege may be asserted against the production of evidence when four prerequisites are met: (1) there must have been a communication, *see Pereira v. United States,* 347 U.S. 1, 6–7, 74 S.Ct. 358, 361–62, 98 L.Ed. 435 (1954); (2) there must have been a valid marriage at the time of the communication, *United States v. Evans,* 966 F.2d 398, 401 (8th Cir.), *cert. denied,* 506 U.S. 988, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992); *United States v. Lustig,* 555 F.2d 737, 747 (9th Cir. 1977), *cert. denied,* 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1977) and 434 U.S. 1045, 98 S.Ct. 889, 54 L.Ed.2d 795 (1978); (3) the communication must have been made in confidence, *see Pereira,* 347 U.S. at 6, 74 S.Ct. at 361–62; *Blau,* 340 U.S. at 333, 71 S.Ct. at 302; *Wolfle,* 291 U.S. at 14, 54 S.Ct. at 280; and (4) the privilege must not have been waived. *See United States v. Premises Known as 281 Syosset Woodbury Road,* 71 F.3d 1067, 1072 (2d Cir.1995); *United States v. Figueroa–Paz,* 468 F.2d 1055, 1057 (9th Cir.1972); *Fraser v. United States,* 145 F.2d 139, 144 (6th Cir.1944), *cert. denied,* 324 U.S. 849, 65 S.Ct. 684, 89 L.Ed. 1409 (1945). Only the final two elements are at issue here, and our discussion is confined to the Lavins' contentions that the district court erred in denying them discovery on the issue of confidentiality, and in finding that they had waived the privilege.

### A.

 "[S]ubpoena enforcement proceedings must be adversarial in character and . . . afford an adequate opportunity to raise all objections to (the) administrative subpoena." *FTC v. Atlantic Richfield Co.,* 567 F.2d 96, 106 n. 22 (D.C.Cir.1977) (internal quotations marks omitted). The precise nature of this

adversary proceeding will vary, depending on the particular circumstances of each case. *Id.* Because subpoena enforcement proceedings are generally summary in nature and must be expedited, discovery is not usually permitted. *SEC v. Dresser Industries, Inc.,* 628 F.2d 1368, 1388 (D.C.Cir.) (in banc), *cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980); *United States v. Exxon Corp.,* 628 F.2d 70, 77 n. 7 (D.C.Cir.), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980). Yet when "the circumstances indicate that further information is necessary for the courts to discharge their duty," discovery may be available. *Dresser Industries,* 628 F.2d at 1388. Our review of the district court's decision to permit or disallow discovery is for abuse of discretion. *Northrop Corp. v. McDonnell Douglas Corp.,* 751 F.2d 395, 399 (D.C.Cir.1984).

■ In the district court the Lavins argued that if the court concluded that the SEC's inadmissible hearsay evidence raised disputed issues of fact that precluded the Lavins' assertions of the privilege, the Lavins should be allowed several days to conduct discovery. Specifically, the Lavins sought to depose and cross-examine the BT Securities' witnesses relied on by the SEC, and to depose one or two other persons with knowledge of the circumstances that led to the taping in Chicago. On appeal the Lavins contend that the district court applied the wrong legal standard in denying discovery, focusing on whether the Lavins demonstrated a lack of institutional good faith by the SEC in its investigatory policies instead of on whether the circumstances indicated that additional information was necessary for the court to be in a position to evaluate their privilege claim. The Lavins also contend that the district court abused its discretion by treating the discovery request as part of a "run-of-the-mill" subpoena enforcement proceeding because denial of the requested discovery deprived them of the only means by which they could have developed their side of

the story. We agree that the district court abused its discretion.[4]

The district court relied on *Resolution Trust Corp. v. Frates,* 61 F.3d 962, 965 (D.C.Cir.1995), and *Dresser,* 628 F.2d at 1388, stating that in subpoena enforcement proceedings, discovery procedures beyond interrogatories or affidavits are inappropriate absent extraordinary circumstances. *Lavin,* 937 F.Supp. at 28. Citing *United States v. Fensterwald,* 553 F.2d 231 (D.C.Cir.1977) and *United States v. Marine Midland Bank,* 585 F.2d 36 (2d Cir.1978), the court explained that these "[s]pecial circumstances exist when a person offers some evidence which demonstrates a lack of institutional good faith in an agency's investigatory policies." *Lavin,* 937 F.Supp. at 28. In *Dresser,* however, this court pointed to questions about an agency's good faith in issuing summons as an "example" of circumstances indicating that discovery may be appropriate; the court did not suggest that such questions were the only circumstances that could give rise to the need for discovery. 628 F.2d at 1388. The court's aversion to discovery focused on discovery into an agency's summons decision-making process, and was based on the concern that "subpoena enforcement proceedings [might be transformed] into exhaustive inquisitions into the practices of the regulatory agencies." *Id.* (citations omitted). In the cases relied on by the district court, *Resolution Trust Corp., Dresser, Fensterwald,* and *Marine Midland Bank,* the respondents were challenging the administrative subpoena on the basis that the administrative agency was not acting in good faith, and were thus seeking discovery into the agency's investigative practices. By contrast, the Lavins neither suggested that the SEC had acted in bad faith nor sought discovery into the agency's investigative practices. Hence, there was no danger that the requested discovery would involve an "exhaustive inquisition" into the agency's practices. The proper inquiry was whether special circumstances

---

4. Because the district court erred in denying the Lavins' discovery request, we do not reach the Lavins' contentions that the district court erred in finding that Mr. Lavin knew his telephone conversations were being recorded, erred in applying the wrong legal standard in denying their request for a hearing, and denied them due process by refusing them discovery while relying on their failure to provide supportive testimony as a basis for its finding that the communications were not confidential.

existed requiring discovery, not whether the agency had acted in bad faith. *Dresser Industries*, 628 F.2d at 1388. The district court thus erred in denying the Lavins' discovery request on the ground that "Mr. and Mrs. Lavin have failed to show or even allege a lack of good faith on the part of the SEC." *Lavin*, 937 F.Supp. at 28.

■ As an additional ground for denying the Lavins' discovery request, the district court concluded that "there [was] adequate evidence to decide all issues of credibility and to reach a well-informed result." *Id*. However, the evidence regarding whether Mr. Lavin knew or should have known that his telephone was being recorded was sufficiently in dispute that the court could not properly rely on *ex parte* depositions of employees of BT Securities and ambiguous taped remarks made by Mr. Lavin. Especially because Mr. Lavin's claim that the evidentiary discrepancies resulted from confusion and miscommunication surrounding the issue of taping in Chicago offered a possible explanation for inconsistencies in the testimony of BT Securities personnel, the circumstances warranted granting the Lavins' discovery request.

In concluding that the evidence was adequate to resolve the disputed issue of the confidentiality of the tapes, the district court relied in large part on the *ex parte* deposition testimony obtained by the SEC from four bank employees: Sal Iannuzzi, Michael Ugliarolo, Art Vallette, and David Mellon. *Lavin*, 937 F.Supp. at 26–28. Iannuzzi's deposition lent some support for the SEC's allegation that Mr. Lavin knew his telephone was being recorded. Iannuzzi testified that sometime between February and April 1994, Mr. Lavin had stated that he wanted his telephone lines in Chicago to be recorded because he planned to transact derivatives business out of the Chicago office. *Id*. at 26–27. Ugliarolo's testimony, that he was asked by Iannuzzi to install a recording system in the Chicago office, corroborates Iannuzzi's statement of Mr. Lavin's request. *Id*. at 27. Yet, Ugliarolo's testimony merely points to what Iannuzzi understood Mr. Lavin's instructions to be; it does not directly reveal anything as to Mr. Lavin's intentions, and it

is not necessarily inconsistent with Mr. Lavins' testimony that there was "confusion and miscommunication" as to what should have been taped in Chicago. Vallette's testimony, moreover, is more complex and confused than the district court suggests. *Id*. Vallette testified that, shortly before the tape recording began in the Chicago office, Mr. Lavin stated that he wanted the calls on his telephone and the telephones of the two other traders to be taped. *Id*. But Vallette also testified that from "early on," Mr. Lavin "told me to tape or record his *first line*." (emphasis added). Although Vallette also testified that on more than two or three occasions after March 15, 1994, Mr. Lavin had asked whether the phones were being recorded, he did not specify which phones were referred to, and this testimony is thus not inconsistent with Vallette's testimony that Mr. Lavin expected only his first line to be recorded. With limited probative value similar to that of Ugliarolo's testimony, Mellon's testimony, that Vallette had asked him to check whether the telephones were being recorded, merely sheds light on Vallette's understanding of the requests, not Mr. Lavin's. *Id*.

The district court also found that Mr. Lavin's "own words and actions" demonstrated that he knew that his telephone conversations were being recorded. *Id*. In maintaining that he had no knowledge of the recording, Mr. Lavin stated by affidavit that he had had a meeting with two bank employees, Iannuzzi and Melvin Yellin, where it was expressly decided that Mr. Lavin's private line would not be taped. When questioned by the SEC, Iannuzzi testified that he had no recollection of such a conversation, but also acknowledged that his memory concerning the details of the taping procedures was "extremely weak" and "really hazy." Yellin, Bankers Trust's Assistant General Counsel, had not been deposed by the SEC, and the Lavins neither presented, nor represented that they had sought, his testimony. In denying the Lavins' request for discovery, the district court found it "significant[ ]" that the Lavins failed to offer any proof from Yellin confirming that the conversation described by Mr. Lavin had actually taken place. *Lavin*, 937 F.Supp. at 27. But, in

view of their proffer of evidence supporting their position, as well as the district court's finding in *Procter & Gamble* that Mr. Lavin had no knowledge that conversations on his line were being recorded, it was reasonable for the Lavins to rely on the record in maintaining that the taped conversations were subject to the confidential marital communications privilege, and that, if the district court disagreed, the Lavins were entitled to depose and cross-examine the principal witnesses on which the SEC relied.

Mr. Lavin's recorded statements from telephone conversations during the relevant time period also did not provide a basis for the district court's finding of adequate evidence to determine that the conversations at issue were not privileged. An April 4, 1994, conversation between Lavin in his Chicago office and a New York-based marketer suggested that Mr. Lavin did not believe his line to be taped. Mr. Lavin asked the marketer to place a telephone conference call to a customer, stating: "[Y]ou dial because I want it to be taped." Another taped telephone conversation, on July 19, 1994, arguably points to the opposite conclusion. In referring to a telephone call that he had made about thirty minutes earlier from his Chicago office, Mr. Lavin stated to an associate, "I want to actually get a copy of this tape." The SEC's reconciliation of the two conversations, that the prior statement in April is not inconsistent with Mr. Lavin's knowing of the taping by July, might be persuasive but for Mr. Lavin's statement to his wife on July 21, 1994. Then, in response to Mrs. Lavin's question, "The phone call is being taped?," Mr. Lavin answered, "This line is not taped."

As further grounds in support of their discovery request, the Lavins presented additional evidence supporting Mr. Lavin's asserted lack of knowledge of the taping. First, the claim that his telephone in his private office in Chicago was not supposed to be tape recorded was consistent with the undisputed fact that his private office telephone in his New York office was not taped. Second, Vallette testified that Mr. Lavin appeared to be "surpris[ed]" upon learning that his conversations had been recorded. Third, the undisputed fact that Mr. Lavin, upon learning of the taping from Vallette, asked for the taping to stop tends to corroborate the Lavins' claim that Mr. Lavin had not intended that his telephone line be taped, and that he was previously unaware that it was being taped. Indeed, the Lavins' characterization of events, that Mr. Lavin's telephone was erroneously included among the telephones on which the taping system was installed, is at this point the account that best explains the contradictory evidence before the district court.

■ Consequently, in view of the conflicting nature of the evidence regarding Mr. Lavin's knowledge of the taping, we hold that the district court erred in denying the Lavins' discovery request. A claim of privilege must be "presented to a district court with appropriate deliberation and precision" before a court can rule on the issue, *see Friedman v. Bache Halsey Stuart Shields, Inc.* 738 F.2d 1336, 1342 (D.C.Cir.1984), and the fact that this claim arose in the context of a subpoena enforcement proceeding, rather than routine civil litigation, does not alter this requirement. *See Atlantic Richfield Co.*, 567 F.2d at 106 n. 22. Regardless of the context of the claim, the district court is obliged to resolve the question of privilege on a record that is both fairly and sufficiently developed. The SEC relied on inconclusive *ex parte* deposition testimony and transcripts of Mr. Lavin's conversations that excluded the portion of the tapes in which he told his wife that his telephone was not taped. Mr. Lavin proffered his own version of events, and the district court faulted his failure to present supportive evidence while at the same time denying the Lavins' request to develop their case through discovery. Moreover, as the Lavins observe, allowing them discovery would hardly have interfered with the summary nature of the proceeding: while the Lavins requested only a few days to conduct depositions and cross-examine witnesses, the SEC waited nearly four months to initiate the subpoena enforcement action after production of the tapes had been refused, and the district court's decision came more than six months after the SEC had submitted its application for an order enforcing the subpoena. Under the circumstances, allowing the litigants to develop the record

would not have been unduly burdensome to the parties or the court.

### B.

■ The question remains whether, even if their communications were initially made in confidence, the Lavins subsequently waived the confidential marital communications privilege and the district court thus properly ordered enforcement of the SEC's subpoena for the taped conversations. The district court concluded on two independent grounds that the Lavins had waived the privilege, pointing to their failure to obtain physical possession of the copies of the tapes that were in possession of other entities, and to their selective disclosure of the privileged materials in litigation.[5] *Lavin*, 937 F.Supp. at 30. The Lavins persuasively challenge each ground.

The district court first concluded that the Lavins' conduct was inconsistent with zealous protection of confidential marital communications because Bankers Trust, its counsel, and the Federal Reserve Bank continue to have "unfettered access" to copies of the seven tape recordings, and the Lavins, after asserting the privilege in mid-November 1994, waited until January 1995 to request that Bankers Trust turn over the tapes, and have never taken legal action to compel the bank to turn over the tapes or to destroy them. *Lavin*, 937 F.Supp. at 30–31. The court found that although Mr. Lavin knew no later than September 2, 1994, that his previous telephone conversations had been tape recorded, his "failure to act" to retrieve the recordings impugned "the mantle of confidentiality" surrounding the telephone conversations. *Id.* (quoting *United States v. De La Jara*, 973 F.2d 746, 750 (9th Cir.1992)).

■ In the attorney-client context, this court adheres to a strict rule on waiver of privileges.[6] "[T]he confidentiality of communications covered by [a] privilege must be jealously guarded by the holder of the privilege lest it be waived." *In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989). If the holder wishes to preserve its privilege, "it must treat the confidentiality ... like jewels—if not crown jewels." *Id.* In other words, the holder must zealously protect the privileged materials, taking all reasonable steps to prevent their disclosure. *See Permian Corp. v. United States*, 665 F.2d 1214, 1220 & n. 11 (D.C.Cir.1981); *see also De La Jara*, 973 F.2d at 749. Generally, the considerations that support a strict approach to waiver in the attorney-client context would appear to apply as well in the marital context: while both privileges serve to promote important public interests by encouraging full and frank communications within special relationships, *see Jaffee v. Redmond*, —— U.S. ——, ——, 116 S.Ct. 1923, 1929, 135 L.Ed.2d 337 (1996); *Trammel*, 445 U.S. at 51, 100 S.Ct. at 912–13, they must be narrowly construed because of their adverse effect on the full disclosure of truth. *See University of Pennsylvania v. EEOC*, 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990) (citations omitted); *see also In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672, 674 (D.C.Cir.), *cert. denied sub nom. Sea Land Service, Inc. v. United States*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979).

However, the question of the Lavins' alleged waiver arises in an unusual context, different from that of any of the cases on which the district court and the parties rely. The Lavins assert the privilege with regard to communications, the physical manifesta-

---

**5.** In so ruling, the district court "[a]ssum[ed] *arguendo* that the privilege would attach and that Mrs. Lavin could assert the privilege independent of her husband." *Lavin*, 937 F.Supp. at 30. Previously, however, the court had ruled that Mrs. Lavin did not have an independent privilege to assert. *Id.* at 29. In light of our disposition, we do not reach the Lavins' contention that the district court erred in ruling that Mrs. Lavin could not independently claim the privilege. Because resolution of this question of first impression may prove unnecessary after further discovery following the remand, depending on Mr. Lavin's ability to assert the privilege, we reserve decision on it. On remand the Lavins may continue to press their argument and, if necessary, raise this issue in a subsequent appeal.

**6.** *See generally Gray v. Bicknell*, 86 F.3d 1472, 1483–84 (8th Cir.1996) (discussing three approaches to waiver of the attorney-client privilege by inadvertent disclosures).

tions of which belong to a third party, Mr. Lavin's employer. Consequently, the cases cited that discuss implied waiver when the holder of the privilege or his attorney is in possession of the materials at issue and fails to take adequate precautions to maintain their confidentiality,[7] *i.e.*, negligent or inadvertent disclosures, offer limited guidance on whether disclosures by third parties over whom the holder of the privilege has virtually no control, *i.e.*, involuntary disclosures, may nonetheless be held to constitute waiver. In cases of involuntary disclosure, at least one court has held that waiver occurs only when the holder has failed to take reasonable steps to reclaim the protected material. Thus, in *De La Jara*, on which the district court relied, the Ninth Circuit upheld the finding of waiver where the police, in executing a search warrant, seized a letter written by the defendant to his attorney and, during the six-month period between the seizure and the introduction of the letter at trial, the defendant failed to avail himself of various legal means (such as filing a motion to suppress the letter under Federal Rule of Criminal Procedure 12(b)(3), or a motion for return of property under Federal Rule of Criminal Procedure 41(e)) that would have enabled him to claim the privilege or even perhaps recover his property. 973 F.2d at 750. The Ninth Circuit observed:

> [W]hen the disclosure of privileged material is involuntary, we will find the privilege preserved if the privilege holder has made efforts 'reasonably designed' to protect and preserve the privilege. Conversely, we will deem the privilege to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter.

*Id.* at 749. Although *De La Jara* dealt with privileged communications disclosed under compulsion by law enforcement authorities, the Ninth Circuit's reasoning in another case (cited with approval in *De La Jara*) made clear that the standard applied to "compelled" disclosures would similarly apply in circumstances, such as those at issue here, where a party had no real control over the disclosure or nondisclosure of documents.[8]

In our view the Ninth Circuit's standard with regard to involuntary disclosures strikes the proper balance between the conflicting policies of facilitating truth-seeking by construing privileges strictly and, at the same time, fairly and adequately "protect[ing] the privacy of marriage and encourag[ing] open and frank marital communications." *United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir.), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985); *see also Wolfle*, 291 U.S. at 14, 54 S.Ct. at 280. In light of the modern regulatory age and technological advances, moreover, such an approach is necessary precisely because the ability to protect against all disclosures is becoming increasingly elusive.[9] *See* 1 McCORMICK § 74, at 276; 2 WEINSTEIN ¶ 503(b)[02] (1996). Unless communications remain privileged as long as the holder has acted reasonably in attempting to protect them, involuntary disclosures by third parties may render illusory the privilege's guarantee of privacy.[10]

Applying the Ninth Circuit's approach here, we conclude that the Lavins took all reasonable steps to protect their taped conversations from disclosure and thus did not waive the privilege. Contrary to the district court's conclusion, the Lavins were not obligated to take any legal action during the

---

**7.** *See De La Jara*, 973 F.2d at 748; *In re Sealed Case*, 877 F.2d at 977; *In re Sealed Case*, 676 F.2d 793, 817 (D.C.Cir.1982); *Permian Corp.*, 665 F.2d at 1217; *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d at 674; *In re Horowitz*, 482 F.2d 72, 74 (2d Cir.1973); *RTC v. Dean*, 813 F.Supp. 1426, 1428–30 (D.Ariz.1993); *O'Leary v. Purcell Co.*, 108 F.R.D. 641, 643–45 (M.D.N.C.1985); *In re Dayco Corp. Derivative Securities Litigation*, 102 F.R.D. 468, 469–70 (S.D.Ohio 1984).

**8.** See *Transamerica Computer Co. v. IBM*, 573 F.2d 646, 650–51 (9th Cir.1978).

**9.** The Federal Rules of Evidence acknowledge that the law of privileges should not remain frozen but instead adjust to changing circumstances in light of reason and experience. *See Trammel v. United States*, 445 U.S. 40, 47–48, 100 S.Ct. 906, 910–11, 63 L.Ed.2d 186 (1980) (discussing Fed R.Evid. 501).

**10.** *See* Natalie A. Kanellis, Comment, *Applicability of the Attorney–Client Privilege to Communications Intercepted by Third Parties*, 69 Iowa L.Rev. 263, 270–71 (1983).

period from early September 1994, when Mr. Lavin knew that some of his conversations were taped, until mid-November, when the Lavins did assert their privilege. Unlike *De La Jara*, where the defendant had reason to be aware of the threat that his letter would be used in the prosecution against him, as well as ample opportunities under the Federal Rules of Criminal Procedure to assert the attorney-client privilege prior to the introduction of his letter into evidence, until the Lavins were first notified by Bankers Trust that copies of the tapes had been turned over to the Federal Reserve Bank of New York, there was no event that should have triggered their assertion of the privilege. The fact that Mr. Lavin knew no later than September 1994 that his telephone line had been routinely recorded for the past five to seven months did not mean that he was obligated at that time to try to recollect all of the conversations that he had with his wife on that line and assert the privilege in a vacuum, anticipating production requests by third parties. Even if Mr. Lavin could have foreseen that third parties might eventually seek to examine the tapes, we know of no case, and the SEC points to none, that requires a privilege holder to engage in a preemptive strike to prevent further disclosure of involuntarily disclosed, privileged materials—in other words, to assert the privilege or institute other legal measures absent a concrete threat of further disclosure.[11]

The inadvisability of adopting an affirmative duty is clear given the difficulties that arise in determining what would constitute sufficient preemptive measures, as well as the unfairness and wastefulness of requiring the privilege holder to take affirmative action likely to prove unnecessary or ineffective. Rules of privilege are designed to afford its holder the right to protect himself or herself against the use of privileged materials in legal proceedings; they do not, as Professor McCormick points out in his treatise, "speak directly to the question of unauthorized revelations of confidential matter outside the judicial setting." 1 McCormick § 72.1, at 271–72. Bankers Trust maintained the tapes primarily for the purpose of resolving trading disputes with customers. Had there been a customer complaint that required examination of his conversations with his wife, Mr. Lavin reasonably could have expected to have been afforded the opportunity by the Bank to review the tapes of his conversations—much as he was in fact later afforded this opportunity—and at that point decide whether to assert any privilege. Here, as soon as Bankers Trust alerted Mr. Lavin in mid-November of the Federal Reserve's examination, the Lavins asserted the privilege, and they were under no obligation to have done so earlier.[12]

Upon learning that the tapes had been sought by and delivered to the Federal Reserve Bank, the Lavins immediately asserted the privilege against all three entities in possession of the tapes: Bankers Trust, Bankers Trust's counsel, and the Federal Reserve Bank. In addition, they secured an arrangement whereby Bankers Trust would provide them with notice and an opportunity to object before it would produce copies of the tapes in response to any discovery requests. Thereafter, when Bankers Trust denied the Lavins' request to turn over the tapes because of outstanding subpoenas and document requests, the Lavins reconfirmed their assertion of the privilege and received assurances that their agreement concerning disclosure to third parties would be respected. Pursuant to this agreement, after receiving notice that Procter & Gamble sought the tapes in connection with its civil litigation against Bankers Trust, the Lavins immediately asserted the privilege and intervened in that case to preclude the tapes' production. The tapes have not been produced to any other parties. Hence, the district court erred in finding that third parties continued

---

**11.** By contrast with *Permian Corp.*, 665 F.2d at 1221, where an affirmative duty to retrieve the documents was placed on the party, the instant case involves an involuntary disclosure, not a voluntary disclosure, and the documents in *Permian Corp.* belonged to the party, whereas here the tapes do not belong to the Lavins.

**12.** The SEC points to no evidence in the record showing that, before the Lavins' assertion of the privilege, anyone had listened to the Lavins' taped conversations other than in connection with production requests made to the bank by the Federal Reserve Bank and the SEC.

to have "unfettered access" to the tapes of the Lavins' conversations at the time of the district court's ruling, *Lavin,* 937 F.Supp. at 31; instead, any access was encumbered by the Lavins' assertion of the privilege.

The fact that the Lavins did not institute formal legal proceedings to gain physical possession of the tapes is irrelevant. The existence of a legally cognizable privilege has no bearing on the ownership of a document or recording; it simply determines whether the information contained in such materials should be subject to disclosure in a legal proceeding. *Cf.* McCORMICK § 72.1, at 271–72. Regardless of whether the Lavins "possibly," as the SEC suggests, might have been able to bring an action under the federal wiretap statute to order Bankers Trust to erase or destroy the tapes, *see* 18 U.S.C. §§ 2520, 2521,[13] the Lavins took reasonable action to protect the confidentiality of the conversations by asserting the privilege as soon as there was a threat of further disclosure to third parties;[14] taking reasonable precautions to preserve the confidentiality of privileged materials does not require gaining physical possession in cases such as this where the disclosure was completely involuntary and, in any event, attempts to gain such possession would have been futile because the tapes were not the property of the Lavins. Under these circumstances, it was sufficient for the Lavins to assert the privilege as soon as they were notified of the requests for the tapes by the Federal Reserve, and to assert the privilege here and in other litigation. Unlike the party in *Permian Corp.,* 665 F.2d at 1219, the Lavins had not disclosed or permitted disclosure of the tapes of their conversations to anyone.

■■■■ Bankers Trust and its counsel's initial review of the tapes also did not consti-

tute waiver by the Lavins; there were numerous reels of tape recordings of telephone conversations held by Bankers Trust, and only because these entities were able to examine the tapes did the Lavins learn which tapes contained their conversations and have the opportunity to claim that they were privileged. *Cf. Transamerica Computer,* 573 F.2d at 651. Likewise, Bankers Trust and its counsel's subsequent examination of the tape recordings in connection with the ongoing investigation or related litigation, even after the Lavins claimed the confidential marital communications privilege, did not constitute waiver by the Lavins. The Lavins specifically requested that Bankers Trust take all steps necessary to preserve the privilege, and it was reasonable for the Lavins to assume that this request would be honored. Indeed, the bank's notice to the Lavins in mid-November that the Federal Reserve's request for tapes included tapes of their conversations indicated that the bank intended to respect the Lavins' assertion of the privilege. It was also reasonable, moreover, for the Lavins to expect that Bankers Trust's counsel would respect their asserted privilege. As the bank's agents, the attorneys were no less bound than the bank to respect the bank's commitments to the Lavins. Any violation by Bankers Trust and its counsel of the asserted privilege did not result from the Lavins' conduct, and hence did not constitute waiver by the Lavins.

■■■■ Finally, Bankers Trust's production of the Lavins' tapes, which were included among several thousand other tapes, to the Federal Reserve Bank of New York also did not constitute waiver by the Lavins. Bankers Trust produced the tapes for the Federal Reserve, not pursuant to a subpoena, but in response to the Federal Reserve's exercise of its examination powers. *See* 12 U.S.C.

---

13. The Lavins contend that such a remedy was unavailable because, in order to seek relief under the wiretap statute, the interception must have been "willful" and not, as the Lavins maintain in the instant case, the result of inadvertence or mistake. In light of our conclusion that the privilege claim does not rise or fall on whether the Lavins filed a lawsuit to obtain possession or destruction of the tapes, we have no occasion to decide whether such a lawsuit would have been available to the Lavins under the wiretap statute.

14. The record suggests that Mr. Lavin's control over and access to the taped conversations at issue was limited. Mr. Ugliarolo, a managing director at Bankers Trust, for example, testified that Mr. Lavin did not have authority to stop the taping once it started. Also, the seven taped conversations were not in the form of separate cassettes, but were embedded in large reels of tape containing many conversations over many months.

§ 325. At that time, neither Bankers Trust nor its counsel had reviewed any of the thousands of tapes to determine whether they contained privileged communications. In connection with production of the tapes, however, Bankers Trust provided the Federal Reserve with a list of all tapes for which the bank was asserting a privilege. On this privilege list, Bankers Trust asserted the marital privilege on the Lavins' behalf. The Lavins thus asserted the marital privilege against the Federal Reserve as soon as it was reasonably possible to do so.

■■■■ The district court's second ground for finding waiver, that the Lavins waived the privilege by making a selective disclosure in their pleadings in the district court, fares no better. It is true that any disclosure by a holder of a privilege inconsistent with maintaining the confidential nature of marital communications waives the privilege. *See In re Sealed Case,* 676 F.2d at 818. A party may not, for example, selectively disclose part of a privileged communication in order to gain an advantage in litigation. *Id.; see also Permian Corp.,* 665 F.2d at 1221. As noted, the purpose of the marital privilege is to protect the privacy of marital communications, *see Sims,* 755 F.2d at 1241, a purpose that is not served by protecting communications that have been deliberately disclosed, even if only in part. Disclosure is generally inconsistent with confidentiality, and "courts need not permit hide-and-seek manipulation of confidences in order to foster candor." *In re Sealed Case,* 676 F.2d at 818.

In attempting to demonstrate that, at the time of their telephone conversations, they understood their communications to be confidential, the Lavins submitted to the district court for *in camera* review transcripts of the seven taped conversations.[15] In a Memorandum in Opposition to the SEC's Application for Enforcement, the Lavins referred the district court to the following excerpt from one of the conversations at issue as evidence of the Lavins' contemporaneous understanding that their telephone conversations were not being taped and were thus private and confidential:

Mr. Lavin: "This line is not taped."

Mrs. Lavin: "No."

Mr. Lavin: "No...."

The Lavins contend that this disclosure did not constitute a waiver of their privilege, and we agree.

■■■ The prohibition against selective disclosure of confidential materials derives from the appropriate concern that parties do not employ privileges both as a sword and as a shield. The purpose of the privilege is to protect the confidentiality of marital communications: "[it] is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former." *In re Sealed Case,* 676 F.2d at 818. In quoting seven words of one of the taped conversations, the Lavins did not seek to shield the conversations from disclosure while at the same time relying on the conversations to address a substantive issue in the SEC investigation and thereby gain a litigation advantage. Instead, the Lavins sought only to establish the privilege by providing highly probative information regarding the Lavins' assumptions with regard to the nature of their conversations. *See* 1 MCCORMICK § 80, at 299. Because the limited disclosure involved not an unfair tactical manipulation of the privilege, *see In re Sealed Case,* 676 F.2d at 818, but a legitimate showing in support of the claim of privilege, the district court erred in ruling to the contrary.

Accordingly, we reverse the order enforcing the subpoena and remand the case to the district court to allow the Lavins to conduct discovery as the court shall direct, and to

---

**15.** Citing *In re Sealed Case,* 877 F.2d at 980, which involved disclosure of privileged materials to third parties, not to the court, the SEC maintains that the Lavins' uninvited submission of the transcripts for the district court's *in camera* review was improper, and the resulting disclosure thus constituted waiver of the privilege. This contention is meritless. Not only did the district court properly exercise its discretion in deciding to review the tapes *in camera,* but we know of no case, and the SEC points to none, where the submission of privileged material to the court for *in camera* review in order to demonstrate the existence of a privilege has itself been held to constitute waiver.

determine thereafter whether the Lavins may assert the privilege. If the court concludes that Mr. Lavin may not assert the privilege, the Lavins may appeal that determination as well as the district court's prior resolution of Mrs. Lavin's independent claim of privilege.