In re: Neil S. KAGAN, Esquire.

No. 02–8508.

United States Court of Appeals,
District of Columbia Circuit.

Filed On: Dec. 30, 2003.

Before: SENTELLE, HENDERSON,
and ROGERS, Circuit Judges.

PER CURIAM:

### ORDER

Upon consideration of the Report and Recommendation of the Committee on Admissions and Grievances, and the response thereto, which contains a request that the report be published as an addendum to *National Wildlife Federation v. EPA*, 286 F.3d 554 (D.C.Cir.2002), it is

**ORDERED** that the Committee's Report and Recommendation that no disciplinary action be taken against respondent be adopted. It is

**FURTHER ORDERED** that the Report and Recommendation, without attachments, be published as an addendum to *National Wildlife Federation v. EPA*, 286 F.3d 554 (D.C.Cir.2002).

*Report and Recommendation of the Committee on Admissions and Grievances*

This matter relates to the obligations of an attorney who, after receiving and reviewing information from a litigation adversary, realized that the information was confidential information that had been produced inadvertently. For the reasons set forth below, the Committee concludes that the attorney in question acted responsibly at all times and with due regard for his professional responsibilities. Accordingly, it is the unanimous recommendation of the Committee on Admissions and Grievances that no disciplinary action should be taken in this matter.

I.

*Introduction*

This matter arises out of Neil S. Kagan, Esquire's representation of the National Wildlife Federation and others (collectively referred to hereafter as "NWF") in a challenge of rule-making by the Environmental Protection Agency ("EPA"). Specifically, EPA promulgated certain rules under the Clean Water Act and the Clean Air Act in connection with the regulation of the pulp and paper industry. In doing so, EPA chose one set of regulations ("Option A") over another ("Option B"), having concluded, among other things, that the latter option would prove too costly to the industry and would result in mill closures and the likely bankruptcy of major paper companies. EPA reached this conclusion based in part upon confidential business information ("CBI") provided to it by various companies in the industry. Mr. Kagan, on behalf of NWF, challenged EPA's conclusion that Option B — which provided for greater environmental protections — was too costly.

Knowing that EPA had relied upon CBI in reaching its decision — information to which Mr. Kagan did not have access because of its confidential designation — Mr. Kagan sought production of all CBI through a motion to compel. This Court denied the motion by order dated February 2, 2000, which read in pertinent part:

> [T]he motion to compel ... [is] denied. The confidential business information NWF seeks is the type of sensitive information and confidential or trade secret information that EPA can properly withhold from public view. The material contained in the public record appears

sufficient for NWF to mount a challenge to EPA's rulemaking.

*See* Attachment A hereto (citations omitted).

Thereafter, in late May 2000, in preparing NWF's merits brief to be filed with this Court on June 9, 2000, Mr. Kagan printed certain spreadsheets that had been obtained from EPA nearly a year earlier via electronic mail. Mr. Kagan first reviewed the spreadsheets while working at home in the evening of May 30, 2000. The spreadsheets had been created by EPA from CBI provided to it by members of the paper and pulp industry. One of the spreadsheets contained information that Mr. Kagan considered quite valuable in the advancement of his client's arguments that Option B was not prohibitively expensive. When he first reviewed this spreadsheet, Mr. Kagan did not notice the letters "CBI" printed on page three of the document. Upon scrutinizing the document more closely the following day, however, he realized that the information contained in the document had been classified as "CBI" and that EPA had inadvertently produced the document to him.

Mr. Kagan immediately recognized that he was confronted with a serious ethical issue and sought to determine the appropriate course of action. The next morning he spoke to his supervisor, and, without relating the contents of the document, informed him of the inadvertent production of the CBI material and of the fact that the document was quite helpful to NWF's case. The supervisor then contacted NWF's general counsel, who referred Mr. Kagan to outside counsel specializing in legal ethics. Outside counsel advised Mr. Kagan that Mr. Kagan was obliged — as a zealous advocate for his client — to utilize the document in connection with his brief to this Court. Counsel further advised Mr. Kagan that his brief should be filed under seal so that there would be no public disclosure of the information contained in the document. Finally, counsel urged Mr. Kagan to contact EPA and notify it of the inadvertent disclosure.

Ultimately, the relevant spreadsheet was not cited or appended to NWF's brief; rather, through negotiations initiated by EPA, Mr. Kagan was supplied with an alternative citation which was used in the brief filed with the Court. Mr. Kagan initially refused EPA's request for the return of his printout of the spreadsheet, maintaining that he needed to retain it in the event the factual assertions in his brief were challenged. The document later was returned to EPA after EPA stipulated to the crucial information contained in the document.

The industry parties responded by filing with the Court a motion for sanctions against NWF. Rather than ruling on the motion, this Court referred Mr. Kagan to the Committee on Admissions and Grievances:

> We begin and end our analysis with this Court's Order denying NWF's motion to compel.... We issued our Order in direct response to NWF's request for CBI — the CBI it subsequently received, used, and retained. Our Order stated clearly that "[t]he confidential business information NWF seeks is the type of sensitive information and confidential or trade secret information that EPA can properly withhold from public view." The effect of our Order was simple: NWF requested access to the information; we denied the request. That NWF later received this information inadvertently in no way changes our designation of his material as "confidential," "sensitive," and similar to "trade secret information," and in no way changes our position that NWF counsel

should not have had access to it. Because of that, we fail to understand how NWF counsel, after receiving the information and learning of the inadvertent disclosure, could justify retaining and using the information in his possession.

NWF counsel, and the attorney he consulted, relied on ethics and judicial opinions which hold that under some circumstances, a privilege is waived if inadvertently released by the privilege holder. In doing so, NWF counsel and his attorney appear to have mischaracterized the operative facts and been unaware of caselaw from this Circuit that closely resembles the question at hand: whether the inadvertent disclosure of privileged or confidential information *maintained by a third party* (here, EPA) constitutes waiver. *See SEC v. Lavin*, 111 F.3d 921 (D.C.Cir.1997).

\* \* \*

We understand, however, that the present situation involves an Order of this Court concerning trade secret information rather than an evidentiary privilege. The holding of *Lavin* then, while instructive, is not necessarily controlling. The *Lavin* holding does instruct us, however, to seriously question the propriety of counsel's actions, especially when taken together with the language of our Order denying NWF access to the very information NWF now argues it was entitled to use. For these reasons, rather than impose sanctions against NWF counsel, we refer this matter to the Committee on Admissions and Grievances for its consideration and such recommendation or petition to the Court as the Committee may see fit to present. *See In re Door*, 195 F.2d 766, 770 (D.C.Cir.1952).

*Nat'l Wildlife Federation v. E.P.A.*, 286 F.3d 554, 575–76 (D.C.Cir.2002) (emphasis in original).

## II.

### *Investigation by the Committee*

The full Committee met and conferred on various occasions in connection with this matter. On July 31, 2002, it conducted a four-hour hearing at which it took sworn testimony of Mr. Kagan and the outside counsel he consulted in connection with the CBI material, David N. Webster, Esquire. No attorney-client privilege was asserted by Mr. Kagan.

The Committee also reviewed the following documents, among others:

1. NWF's motion to compel production of CBI, the opposition thereto, and this Court's order denying the motion to compel;

2. A redacted version of the spreadsheets inadvertently provided to Mr. Kagan;

3. The stipulation between NWF and EPA regarding the inadvertently-produced spreadsheets;

4. The motion for sanctions, and the opposition thereto;

5. The appellate briefs filed by the parties;

6. The tape recording of the oral argument before this Court;

7. Affidavits and declarations of Neil S. Kagan, David N. Webster, Carol Ann Siciliano, Paul L. Benington, Geoffrey H. Grubbs, Nicholas Bennett, Michael Grady Jackson, John E. Bonine, Eileen Morgan Johnson, Andrew P. Buchsbaum, and Peter E. Seley; and

8. Written submissions by counsel for Mr. Kagan in connection with the Committee's hearing.[1]

### III.

*Factual Findings of the Committee*

After hearing the testimony of Mr. Kagan and Mr. Webster, and after reviewing the other materials set forth above, the Committee credits that testimony and makes the following findings of fact:

1. On November 9, 1998, after unsuccessfully negotiating with EPA for disclosure of the CBI on which it relied in promulgating the regulations at issue in this case, Mr. Kagan filed a motion to compel EPA to disclose the CBI (Tr. 25–26).[2]

2. In June of 1999, Mr. Kagan asked a law clerk to contact EPA and request public documents relating to "which mills were using the oxygen delignification ["OD"] technology" (Tr. 53). He needed this information in connection with establishing his client's Article III standing (Tr. 46).[3]

3. Also in June of 1999, EPA responded to the law clerk's e-mail request by transmitting an e-mail entitled "Mill w/OD list" and attaching spreadsheets (Tr. 39). The law clerk, finding the document unhelpful on the issue of standing, forwarded it nonetheless to Mr. Kagan on June 15, 1999 with a notation explaining that the document was not particularly useful (Tr. 39–40). Mr. Kagan archived the e-mail on his computer without reading the attachments.

4. On February 2, 2000, the Court denied NWF's motion to compel production of CBI material (see Attachment A hereto).

5. Settlement discussions among the parties had broken down by April/May 2000, and Mr. Kagan turned his attention to preparing NWF's merits brief, due in this Court on June 9, 2000. Mr. Kagan directed staff members to determine "how many hardwood lines did not use [oxygen delignification technology]" (Tr. 62), in an effort to demonstrate that EPA's rejection of Option B was erroneous because the projected cost of Option B was inflated.

6. In late May 2000, Mr. Kagan began to assemble the large number of documents already amassed during the litigation. Mr. Kagan planned to review the documents before filing his brief to ensure that no useful information had been overlooked (Tr. 65). In doing so, Mr. Kagan opened the archived e-mail that he had originally received from his law clerk on June 15, 1999, and printed the attached document, which "contained three spreadsheets, the second of which contained CBI and included the notation 'CBI' above the spreadsheet." *Nat'l Wildlife Federation v. E.P.A.*, 286 F.3d 554, 574 (D.C.Cir.2002); *see also* Tr. 67–68. He then placed the spreadsheets in the pile of documents he planned to review (Tr. 66).

7. May 30, 2000, while working at home in the evening, Mr. Kagan first re-

---

1. The Committee has not appended all the voluminous materials submitted in connection with the hearing; however, the Committee would be pleased to make them available to the Court should it wish to review them.

2. "Tr." refers to the transcript of the hearing held by the Committee on July 31, 2002, which is appended hereto as Attachment B.

3. Mr. Kagan explained: "Our claim was that EPA rejected the OD technology and adopted

the clust[er] rules[,], so I needed to know which mills were not using the OD technology because people living downstream of those mills would be harmed by EPA's failure to require the OD technology as the best available technology" (Tr. 53). That is, if Mr. Kagan's clients were located near mills using the OD process, then the clients could not claim any injury and thus did not have standing to complain about the rule-making (Tr. 53–54).

viewed the spreadsheets. He immediately saw that one of them provided the "number of hardwood lines that did not use [oxygen delignification]" (Tr. 87), which was the very information for which he had been searching (Tr. 87).

8. The following day, May 31, 2000, Mr. Kagan examined the document again and saw for the first time the initials "CBI" on page three of the spreadsheet in question. The Committee, having seen the document (with the CBI material itself redacted), can assure the Court that "the CBI notation was only located on the first page of the second spreadsheet [the third sheet in the document], and was in all other ways inconspicuous." *See* 286 F.3d at 574.[4] *See also* (Tr. 91–92).[5]

9. The document had been inadvertently produced to Mr. Kagan by EPA. *See* Decl. of Geoffrey H. Grubbs, Director of Office of Science and Technology, Office of Water, EPA (Attachment D hereto).

10. Upon making this discovery, Mr. Kagan immediately took steps to determine the proper course of action.

a. Mr. Kagan informed his immediate supervisor and sought his advice (Tr. 94). Mr. Kagan did not disclose the confidential information to his supervisor (Tr. 95).

b. Mr. Kagan then contacted NWF's general counsel, repeated his concerns, and again asked for advice about "the right thing to do . . . with the information, whether [he] could use it or what" (Tr. 96). He further told NWF's general counsel that he "needed expert counsel" (Tr. 96).

c. NWF's general counsel referred Mr. Kagan to outside counsel, David N. Webster, Esquire. Mr. Webster, a member of the District of Columbia Bar and the Ma-

ryland Bar, has considerable experience in legal ethics (Tr. 161–62). In the 1960s he served on the legal ethics committee of the District of Columbia Bar Association, including as chairman. He later served for five years on the D.C. Bar Legal Ethics Committee. He has regularly represented and advised lawyers and law firms (including his own) on legal ethics. Mr. Webster has also lectured on legal ethics at prestigious law schools.

d. Mr. Webster was already generally familiar with the issue of a lawyer's obligation upon the receipt of confidential information inadvertently disclosed by an adversary, due to work he had done for other clients (Tr. 162, 179, 183). Mr. Webster was also familiar with D.C. Bar Legal Ethics Committee Opinion 256 (Inadvertent Disclosure of Privileged Material to Opposing Counsel) (June 1995), although Mr. Webster had not been a member of that committee at the time that opinion was issued (Tr. 183).

e. Mr. Kagan consulted with Mr. Webster, informing him of the relevant facts. Among other things, Mr. Kagan "told him there had been a Motion to Compel," "read the language of the order denying the Motion to Compel," and explained that the CBI information contained in the document "was essential to . . . one of the arguments in [the] case" and said that he "needed his advice on what to do with it" (Tr. 101–02, 165). Based in large part on Opinion 256 (Tr. 170–71), Mr. Webster advised him to contact EPA and inform officials about the disclosure, and told him he should use the information in his brief, provided that the brief were filed under seal (Tr. 104).

---

4. Indeed, at the hearing held by the Committee, some members asked Mr. Kagan to point out the CBI notation, as it was not readily apparent on the printed spreadsheet itself.

5. The redacted spreadsheet is attached hereto as Attachment C.

f. After receiving outside counsel's advice, Mr. Kagan read the ethics opinion cited to him by counsel (Tr. 128–29). He concluded that the opinion "seemed to support his advice or did support his advice because it dealt with a very analogous situation" (Tr. 129).

g. Mr. Kagan sought the advice of yet another attorney, who also recommended filing the brief under seal (Tr. 125–26).

h. Mr. Kagan then followed the advice of counsel and telephoned EPA's counsel on that same day, May 31, informed EPA's counsel of the inadvertent disclosure of the material, and advised her that he planned to use the information in his brief and that he planned to file the brief under seal (Tr. 129–30). Mr. Kagan also forwarded to EPA's counsel a copy of the 1999 EPA e-mail attaching the spreadsheets in question (Tr. 131–32).

i. On his own initiative, Mr. Kagan later placed the document in a safe deposit box "so that nobody else could see [it]" (Tr. 153–54). He also deleted the document from his hard drive and backup. *See* Kagan Decl. ¶ 38 (Attachment E hereto).

11. Counsel for EPA — not Mr. Kagan (Tr. 136)[6] — then proposed that, in exchange for Mr. Kagan not citing the document in his brief, EPA would supply him with an alternative citation of a summary nature (Tr. 133, 135–36, 137). Mr. Kagan agreed to this proposal (Tr. 133).

12. Counsel for EPA "regularly" requested that Mr. Kagan return the document (Tr. 139). Mr. Kagan did not do so immediately, however, for the following reasons:

I was concerned that well, first of all, I was only going on [counsel for EPA's] word that the cite she had given me actually supported the statement that there [were] 47 hardwood lines. I had

nothing without that spreadsheet to document that was a correct number. So I needed to retain it so I could prove that that was the right number if EPA or the intervenors contested the accuracy of the number.

(Tr. 139–40).

13. Thereafter, EPA and NWF entered into a stipulation regarding the number of hardwood lines, and Mr. Kagan then returned the document to EPA, following the agency's specific directions for returning the document (Tr. 154). As a result, the document was not cited or appended to NWF's brief filed with this Court. There was never any unauthorized disclosure of the CBI, except for EPA's inadvertent disclosure to Mr. Kagan.

## IV.

### *Conclusion*

There is no dispute that EPA inadvertently disclosed confidential business information to Mr. Kagan, and the Committee credits Mr. Kagan when he says that he reviewed the contents of the document and absorbed its meaning and significance before discovering the almost imperceptible letters "CBI" on an internal page of a multi-page document. Thus, Mr. Kagan was faced with the ethical dilemma of having unexpectedly, and initially unknowingly, gained knowledge of information that was simultaneously extremely helpful to his client and unquestionably confidential. Having had the opportunity to observe Mr. Kagan's demeanor over a four-hour period, to listen to his detailed description of events as they unfolded, and to hear from counsel who recommended the course of action Mr. Kagan undertook, as well as to review the affidavits of other individuals, the Committee concludes that Mr. Kagan

---

**6.** *See* Decl. of Carol Ann Siciliano, EPA Office of General Counsel (Attachment F hereto) ¶ 4.

acted entirely in good faith and made every effort to follow the rules of professional responsibility. We nevertheless address the two concerns expressed by the Court about the manner in which Mr. Kagan chose to handle this predicament.

The Court suggested that Mr. Kagan and his counsel "appear to have mischaracterized the operative facts and been unaware of caselaw from this Circuit that closely resembles the question at hand: whether the inadvertent disclosure of privileged or confidential information *maintained by a third party* (here, EPA) constitutes waiver." 286 F.3d at 575 (emphasis in original) (citing *SEC v. Lavin*, 111 F.3d 921 (D.C.Cir.1997)). As for the "operative facts," the Court's opinion does not point to any specific facts that Mr. Kagan his counsel mischaracterized, and the Committee uncovered none during the course of the hearing. With regard to Mr. Kagan's and Mr. Webster's "unawareness of the case law from this Circuit," the Committee concludes that reasonable attorneys could differ as to the appropriate course of action to take when faced with the dilemma Mr. Kagan encountered on May 30, 2000.

As is apparent from this Court's opinion, neither District of Columbia Bar Legal Ethics Committee Opinion 256 (1995), upon which Mr. Kagan relied, nor *Lavin*, cited by the Court, is squarely on point. Opinion 256 dealt with a situation where counsel for one party inadvertently discloses privileged information to counsel for another party. The Opinion concluded that where the receiving counsel has reason to believe the disclosure is deliberate, and is unaware that it was inadvertent, receiving counsel ethically may utilize the information. As this Court correctly observed, Opinion 256 did not address the situation where the information inadvertently disclosed actually belonged to a third party who had taken every step to prevent disclosure of privileged information. The Court also noted, however, that *Lavin* dealt with information protected by an evidentiary privilege, while the circumstances in this case involved "an Order of this Court concerning trade secret information." 286 F.3d at 576. Furthermore, *Lavin* dealt with possible waiver rather than with the ethical obligations surrounding an inadvertent disclosure. Thus, "[t]he holding of *Lavin* ..., while instructive, is not necessarily controlling." *Id.*

The Committee concludes that Mr. Kagan's reliance upon Opinion 256 was reasonable under the circumstances. The analysis of Opinion 256 may be read to apply to the facts here. The Committee notes that Opinion 256 expressly relied upon *Aerojet–General Corp. v. Transp. Indem. Ins.*, 18 Cal.App.4th 996, 22 Cal. Rptr.2d 862 (Ct.App.1993), wherein the court found no ethical violation in a receiving lawyer's reading and use of a confidential document inadvertently produced by a third party. Opinion 256 arguably was the most closely analogous authority available to Mr. Kagan.

The D.C. Bar Legal Ethics Committee has recently opined that the analysis in Opinion 265 may apply in factual contexts beyond the one presented in that opinion. In Opinion 318 (Disclosure of Privileged Material by Third Party) (December 2002), the D.C. Bar Legal Ethics Committee appears to conclude that it would not be an ethical violation for a lawyer to use privileged information of an adversary even where the lawyer received the information in circumstances where the privilege was not waived: "If the privileged status of the document does not become apparent to receiving counsel until after the document has been reviewed, as reflected in D.C. Opinion 256, it is too late for receiving counsel to take corrective action because

the information cannot be purged from his mind and his obligation of zealous representation under Rule 1.3 at that point trumps confidentiality concerns."[7]

The Committee on Admissions and Grievances is aware that there is considerable debate and discussion in various quarters as to the obligations of lawyers receiving inadvertent disclosures under various circumstances. This Committee does not believe that it is necessary or even appropriate for it to attempt to reconcile the various views or to resolve the debate. The Committee is charged solely with providing its recommendation as to whether discipline is warranted on the facts presented here. On the facts presented here, the Committee finds that Mr. Kagan acted reasonably and with due regard for his ethical obligations.

Faced with no clearly controlling ethical rule and with case law and ethics opinions that were at best analogous to the facts of this case, Mr. Kagan should not be sanctioned for relying upon a reasonable interpretation of permissible attorney conduct.[8] *See In re Ruffalo*, 390 U.S. 544, 556, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) (White, J. concurring) ("I would hold that a federal court may not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct."); *see also In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 698 (N.D. Ga.1998) (district court declines to impose sanction on attorney who utilized documents inadvertently

produced in litigation because, in court's view, "it is debatable whether [a certain ethics opinion] establishes an ethical rule that governs the conduct of attorneys in this circuit") (citing *Schlumberger Tech. v. Wiley*, 113 F.3d 1553, 1560–61 (11th Cir. 1997)). Mr. Kagan found himself in an ethical dilemma through no fault of his own. He handled the dilemma in a manner that was reasonable, responsible, and defensible.

This Court also viewed Mr. Kagan's temporary retention of the document as a direct violation of the Court's order denying the motion to compel. As a result of the hearing, however, the Committee learned that, in his very first telephone conversation with outside counsel, Mr. Kagan read the Court's order to Mr. Webster (Tr. 102). Thus, Mr. Webster was aware of the order denying the motion to compel when he advised Mr. Kagan. Furthermore, EPA did not take the position that this Court's order was an independent ground for the immediate return of the document. The Committee agrees that the order denying the motion to compel does not appreciably affect the analysis of Mr. Kagan's obligations in circumstances in which he had already reviewed the CBI through no fault of his own. Additionally, contrary to what was posed in the motion for sanctions, it does not appear that Mr. Kagan used the document as a bargaining chip with EPA. Mr. Kagan explained to EPA's counsel (and to the Committee) that he anticipated that the industry petitioners might challenge a factual assertion that

---

7. Reference to District of Columbia Bar ethical standards is appropriate given that Rule I of this Court's Rules of Disciplinary Enforcement adopts the ethical rules adopted by the District of Columbia Court of Appeals. Opinions of the D.C. Bar Legal Ethics Committee, while not binding on any court, provide valuable guidance to lawyers practicing the District of Columbia and it is reasonable for such lawyers to rely upon these opinions.

8. Indeed, as Mr. Kagan explained at the hearing, no one offered any differing points of view during the negotiations for the return of the document, including counsel for EPA (Tr. 156–57).

was not supported by a record citation and felt that he should retain the document to defend any such challenge. More importantly, it was counsel for EPA that proposed that it supply Mr. Kagan with another citation to the record in exchange for the return of the document, and the document itself was never cited to or appended to NWF's brief filed with the Court. Thus, the Committee is satisfied that Mr. Kagan did not unethically hold the document hostage as part of his litigation strategy.

In sum, the Committee is satisfied that Mr. Kagan acted with the best of intentions, seeking legal advice in the face of an ethical dilemma, and relying on the advice of well qualified outside counsel, whose advice was supported by an opinion of the D.C. Bar Legal Ethics Committee. The Committee does not believe that Mr. Kagan has engaged in any misconduct, and therefore the Committee does not believe that any discipline is warranted.

COMMITTEE ON ADMISSIONS AND GRIEVANCES

By:

    Mary Patrice Brown
        Committee Member

    Cornish F. Hitchcock
        Committee Member

    Martha Purcell Rogers
        Committee Member

    Steuart H. Tomsen
        Committee Member

    Christopher M. Curran
        Committee Chairperson

Dated: August 4, 2003