

1998 Decisions

3-13-1998

# In Re: Grand Jury

Precedential or Non-Precedential:

Docket 97-7347

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation
"In Re: Grand Jury" (1998). *1998 Decisions.* Paper 48.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/48

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7347

IN RE: GRAND JURY (IMPOUNDED)

On Appeal from the United States District Court
for the District of Delaware
(D.C. Misc. No. 97-00020)

Argued February 11, 1998

BEFORE: GREENBERG, NYGAARD, and MCKEE,
Circuit Judges

(Filed: March 13, 1998)

        Charles M. Oberly, III (argued)
        Oberly, Jennings & Drexler, P.A.
        800 Delaware Avenue, Suite 901
        P.O. Box 2054
        Wilmington, DE 19899
         Attorneys for Appellant

        Gregory M. Sleet, United States
         Attorney
        Colm F. Connolly (argued),
        Assistant United States Attorney
        Chase Manhattan Centre
        1201 Market Street, Suite 1100
        P.O. Box 2046
        Wilmington, DE 19899-2046
         Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. JURISDICTION

Thomas J. Capano appeals from an order entered in the district court on June 27, 1997, holding that he waived the attorney work product privilege with respect to certain documents he created which the United States seized from a third party pursuant to a subpoena.1  The district court had jurisdiction under 18 U.S.C. S 3231, and we have jurisdiction to review the order of the district court pursuant to 28 U.S.C. S 1291. Cf. In re Grand Jury, 111 F.3d 1066, 1073-77 (3d Cir. 1997) (holding that a denial of an order to quash a subpoena not directed to a movant was a final order if the movant had no further opportunity to challenge the subpoena).

II. FACTUAL AND PROCEDURAL HISTORY

In July 1996, the Federal Bureau of Investigation ("FBI") and a federal grand jury in Delaware began a kidnaping investigation into the disappearance of Anne Marie Fahey, who last was seen alive on June 27, 1996. Capano became the major target of these investigations. At the time of Fahey's disappearance, Capano, who is an attorney, was a partner in the Wilmington office of the Saul, Ewing, Remick & Saul law firm ("Saul Ewing"), a position he held until his resignation on May 31, 1997.

On June 30, 1996, Capano retained attorneys after police officers notified him that they considered him a suspect in Fahey's disappearance. One of Capano's attorneys, Charles M. Oberly, III, directed him to prepare "a time-line of everything he could remember concerning his whereabouts

_____

1. While the proceedings on this appeal originally were sealed, the district court on December 2, 1997, unsealed itsfile in this case. Accordingly, in response to our inquiry at oral argument, the parties agreed that we need not use ficticious names in our opinion.

on June 27, 1996 and immediately thereafter," and to "write down his thoughts and notes, as he remembered them, of anything he could recall about his relationship with Ms. Fahey." App. at 42. Following his attorney's instructions, Capano created a time-line and wrote down other notes regarding his relationship with Fahey and placed them in a legal file.

Capano then put the file on a bookshelf in the office adjacent to his own office at Saul Ewing occupied by of one of his law partners, Timothy A. Frey, because he was concerned that there could be an unauthorized search of his own office leading to an unauthorized seizure of the file. Initially Frey was unaware that Capano placed thefile in his office; however, in August or September of 1996, Capano informed Frey about the location of the file. Within the next month, Frey found the file in his office, read it, and returned it to its prior location on his bookshelf.

The file remained in Frey's office until the United States seized it on November 4, 1996. On that day, Assistant United States Attorney Colm F. Connolly telephoned Frey to inform him that an FBI agent would serve him with a grand jury subpoena for Capano's file. Frey then re-examined the file and determined that it was the same file he had examined previously. Connolly also telephoned the chairman of Saul Ewing, J. Clayton Undercofler, to notify him about the subpoena. Undercofler expressed a concern that the production of the file might reveal information relating to the law firm's representation of its clients. Connolly and Undercofler then agreed that thefile would be produced under seal, and that the law firm would have an opportunity to screen the file for any confidential information.

After these phone calls, FBI Special Agent Kevin Shannon arrived at Frey's office and served the subpoena. The file was placed in an envelope, sealed, and delivered to Assistant United States Attorney Patricia Hannigan, who had been "walled off " from the investigation to avoid any possibility of taint. On November 5, 1996, Hannigan met with Undercofler and Saul Ewing's executive partner, Frederick D. Strober. After unsealing the envelope, the two attorneys from Saul Ewing examined the file and

determined that it did not contain any information relating to the law firm's representation of its clients. Hannigan then examined the file and determined that nothing in it arguably was privileged or protected. She then made a copy of the file which she gave to Connolly. She, however, retained the original file.

Although the parties dispute exactly when Capano learned of the seizure, they agree that Capano and his attorneys did not know that the government intended to seize the file prior to the service of the subpoena and that they were informed of the seizure only after it had occurred. Capano asserts that his attorney first learned of the disclosure on November 6, 1996, two days after the seizure. See br. at 27. In any event, on November 12, 1996, one of Capano's attorneys, Bartholomew J. Dalton, sent a letter to the United States Attorney advising the government that the file contained privileged information. The United States, through Connolly, responded on November 26, 1996, by telephone and informed Dalton that the United States did not believe that the attorney-client privilege or the attorney work product doctrine protected the materials contained in the file. Connolly told him to "take the issue up with the Court." App. at 138.

On at least two occasions between December 30, 1996, and February 1997, Connolly also had telephone discussions with Oberly regarding the applicability of the attorney work product and the attorney-client privileges to the seized documents. In a second letter to the United States dated January 22, 1997, Oberly requested that the government either return the documents in the file or send him a letter stating its opposition to the assertion of the privileges. In response, Connolly formally denied the production request in a letter dated February 25, 1997, contending that the documents were not privileged and that, in any event, Capano waived any privilege when he placed them in Frey's office. Finally, on March 14, 1997, Capano, citing both the attorney-client and the attorney work product privileges, filed a motion in the district court seeking an order compelling the government to return the file.

4

In a memorandum opinion dated June 27, 1997, the district court denied Capano's motion. While the district court held that the attorney-client privilege did not offer any protection to the file, it nevertheless held that the file was attorney work product, because Capano acted as his attorney's agent in creating the file in preparation of litigation. However, the district court determined that Capano waived this work product protection based on both disclosure and timeliness grounds. In particular, because Capano had revealed the presence of the file to Frey and had stored it in Frey's unlocked and easily accessible office, the district court held that Capano disregarded the risk that an adversary might obtain the file, and thus had waived the work product privilege. Alternatively, the district court held that Capano waived the work product privilege by waiting nearly four months to file a motion to compel the return of the seized materials. Finally, the district court noted in a footnote in its opinion that even if Capano did not waive the attorney work product protection of the file, the United States had demonstrated sufficient cause to overcome that protection.

Capano filed a timely appeal to this court on July 7, 1997. Neither party has challenged the district court's holdings regarding the applicability of the attorney-client or the attorney work product privileges; therefore, we accept its determination that the seized file was attorney work product, but was not protected by the attorney-client privilege. Because we will affirm the district court's holding that Capano waived his attorney work product privilege with regard to the seized file based on his delay in seeking a judicial determination, we do not determine whether Capano waived the privilege by disclosing the documents. Nor do we decide whether the United States demonstrated sufficient cause to overcome the work product protection.

III. WAIVER OF THE WORK PRODUCT PROTECTION

In examining the district court's holding that Capano waived his work product privilege, we use an abuse of discretion standard of review. Cf. Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 524 (3d Cir. 1996), cert.

denied, 117 S.Ct. 1311 (1997) (using an abuse of discretion standard to review a waiver of an attorney-client privilege).[2]

The work-product doctrine, first recognized by the Supreme Court in Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385 (1947), "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170 (1975). The privilege thus promotes the adversarial system by protecting the confidential nature of materials prepared by attorneys in anticipation of litigation and "enabl[es] attorneys to prepare cases without fear that their work product will be used against their clients." Westinghouse Elec. Corp. v. Republic of the Philippines, 951 F.2d 1414, 1428 (3d Cir. 1991). This protection also can extend to materials prepared by an attorney's agent, if that agent acts at the attorney's direction in creating such documents. See Nobles, 422 U.S. at 238-39, 95 S.Ct. at 2170.

The attorney work product privilege, however, is not absolute, and it may be waived. See id. at 239, 95 S.Ct. at 2170. Thus, we have held that a party may waive the attorney work product privilege by disclosing protected documents in certain circumstances. See Westinghouse, 951 F.2d at 1428-29. It has been held that a disclosure sufficient to waive the work product protection does not have to be intentional; therefore inadvertent or unintentional disclosures of protected materials also might result in the waiver of the privilege. See, e.g., Carter v. Gibbs, 909 F.2d 1450, 1451 (Fed. Cir. 1990). However, such a disclosure does not automatically forfeit the attorney work product privilege. In determining whether a party has waived the privilege through an inadvertent or involuntary disclosure, courts consider, among other

_____

2. Capano argues in his brief that we should exercise plenary review. Br. at 18-19. We disagree but observe that even exercising plenary review we would reach the same result. While we will assume without deciding that in some circumstances we would exercise plenary review to determine if the work product privilege had been waived, we think that it is appropriate to use an abuse of discretion standard here because the weighing of various considerations leads us to affirm the district court's order.

6

factors, the steps taken by a party to remedy the disclosure and any delay in doing so. See, e.g., United States v. Keystone Sanitation Co., 885 F. Supp. 672, 676 (M.D. Pa. 1994); cf. United States v. de la Jara, 973 F.2d 746, 749-50 (9th Cir. 1992) (holding that a defendant waived his attorney-client privilege with regards to a seized letter because he waited six months after the seizure to assert his privilege). But see Carter, 909 F.2d at 1451 (holding that even an inadvertent disclosure automatically waives the attorney work product privilege, because to do otherwise "would do no more than seal the bag from which the cat has already escaped."). Thus, in the case of inadvertent or involuntary disclosures, the party asserting the work product doctrine must pursue all reasonable means to restore the confidentiality of the materials and to prevent further disclosures within a reasonable period to continue to receive the protection of the privilege.

It is undisputed that neither Capano nor his attorneys knew of the subpoena until after it had been issued and the file had been seized. Consequently, Capano had no opportunity to challenge the involuntary disclosure of the file by seeking to quash the subpoena; instead, his only remedy was to assert the attorney work product privilege after the United States took possession of the file. Capano clearly made a timely assertion of the attorney work product privilege to the government; his attorney mailed a letter asserting the privilege to the United States within eight days after the seizure. However, as of November 26, 1996, Capano and his attorneys were on notice that the United States disagreed with the assertion of the privilege and would not relinquish the file voluntarily. In spite of this knowledge, Capano waited until March 14, 1997, tofile a motion to compel the return of the seized file. Thus, the determinative issue on this appeal is whether Capano's initial assertion of the privilege to the United States sufficiently protected his rights or whether his failure to seek a judicial ruling on the issue more promptly waived the privilege.

We hold that the district court did not abuse its discretion determining that even though Capano timely notified the United States of his claim of the privilege and

7

continued to assert it in subsequent communications, these assertions were insufficient to protect his rights. The United States was a direct adversary of Capano, and its continued use of the documents directly undermined the purpose of the attorney work product privilege of protecting confidential documents prepared in anticipation of litigation from a party's adversary. Capano's repeated admonitions to his adversary to return the protected documents did not prevent the continuing harm resulting from the disclosure. Judicial enforcement of the privilege was the only remedy that Capano could have obtained which would have foreclosed the United States from further use of the seized file. Without such judicial vindication, the United States was free to continue to utilize the documents, thereby negating their confidential character.

In the case of such an involuntary disclosure, a reasonable person would not only inform his or her adversary of the breach of the privilege, but also would seek a judicial determination of the controversy if his or her adversary took an opposing stance. Merely asserting the privilege to an adversary is not sufficient to protect the privilege in these circumstances inasmuch as the adversary has possession of the materials claimed to be privileged and thus can make use of them. Moreover, if the district court countenanced Capano's delay in judicially asserting his privilege and then upheld his claim of privilege, the grand jury's use of the seized file potentially could have tainted its investigation.3

In short, when a party's adversary has obtained possession of a party's work product and refuses to recognize the work product privilege, the party asserting the privilege must move expeditiously for relief particularly

_____

3. In his brief Capano asserts that during the four months before he served his motion, the government had possession of the disputed documents and "is believed to have used these documents in the grand jury proceedings." Br. at 29. He reasons from this belief that there "was no prejudice to the Government as a result of the four-month period between [his] initial assertion of the . . . work product privilege[ ]" and the filing of his motion. Id. While the grand jury in fact did not indict Capano, clearly his argument overlooks the taint problem we have identified.

8

where, as here, the party asserting the privilege does not even claim that he had reason to believe that the adversarial party was not making use of the work product. Indeed, in his brief Capano asserts that in "this entire period," i.e., between November 12, 1996, and March 14, 1997, when he filed his motion, the govenment "used these documents to further its grand jury investigation." Br. at 15–16. While we cannot set an exact time within which such a motion must be made, we hold that the district court did not abuse its discretion in holding that Capano waived the privilege as we are satisfied that Capano acted unreasonably in waiting nearly four months to seek a judicial vindication of his assertion of the privilege.

Capano contends that SEC v. Lavin, 111 F.3d 921 (D.C. Cir. 1997), supports his position that his assertion of the privilege to the United States sufficiently protected his rights. In Lavin, the Securities and Exchange Commission ("SEC") sought to obtain copies of tape recordings of conversations between a husband and a wife. These recordings were made by and were in the possession of the husband's employer, Bankers Trust Company ("Bankers Trust"). See id. at 924. Initially, Bankers Trust had submitted these tapes to the Federal Reserve Board ("Board") as part of a production request pursuant to the Board's examination powers. When Bankers Trust notified Lavin, the husband, that it had relinquished the tapes to the Board, he immediately asserted his marital communications privilege and requested that Bankers Trust assert it on his behalf to the Board. Bankers Trust and Lavin subsequently entered into an agreement whereby Bankers Trust would give him the opportunity to challenge any further requests seeking the release of the tapes. However, Lavin did not institute any legal proceedings against Bankers Trust to obtain the tapes. Subsequently, the SEC sought the disclosure of the tapes, and Lavin asserted his marital communications privilege.

In considering whether the privilege had been waived, the Court of Appeals for the District of Columbia Circuit held that Lavin had no obligation to initiate any legal proceedings against Bankers Trust to protect the conversations "absent a concrete threat of further

9

disclosure." Id. at 931. There was no such threat in Lavin's case, because Bankers Trust continued to abide by its agreement. In fact, Lavin had intervened successfully in an unrelated civil suit to assert his marital communications privilege with respect to the tapes. See id. at 924–25, 931. The court also noted that "taking reasonable precautions to preserve the confidentiality of privileged materials does not require gaining physical possession in cases such as this where . . . attempts to gain such possession would have been futile because the tapes were not the property of [Lavin]." Id. at 932. Thus, Capano argues that like Lavin, he should not have been forced to seek an immediate judicial determination regarding the return of his file, because the disclosure already had occurred and no threat of future disclosures existed.

Aside from the obvious differences in the privileges at issue and the purposes behind them, the facts of Lavin differ substantially from the present case. In Lavin, Lavin took active measures to assure that no one beyond the owner of the recordings, Bankers Trust, had access to them. More importantly, Lavin took legal action against any potential adversary that sought to obtain the recordings, and the entity in possession of the tapes, Bankers Trust, was not such an adversary. Capano was in a more difficult position than Lavin, because the privilege already had been breached by the seizure, and his adversary already had access to the documents. Thus, unlike Lavin, Capano was harmed immediately by the initial disclosure as it was to his direct adversary and not to a third party. Repeated communications by Capano asserting the privilege to his adversary were insufficient to prevent further harm; only timely intervention by a court could accomplish that objective.

Therefore, we reiterate that the district court did not abuse its discretion in determining that Capano waived his attorney work product privilege with regard to the seized documents by failing to file a timely motion to compel their return. Within a few weeks after the seizure of thefile, Capano was on notice both of the seizure and of the government's unwillingness to recognize his attorney work product privilege with regard to the seized file. Yet, he

10

waited nearly four months to seek a judicial vindication of his claim of privilege. This delay is inconsistent with the purpose behind the attorney work product privilege, and thus the district court did not abuse its discretion in determining that Capano's delay waived the privilege.

In view of the aforesaid, we will affirm the order of June 27, 1997.

11

McKEE, Circuit Judge, concurring.

I concur with the holding of the majority. I write separately for two reasons. First, I think that we should reject the assertion that the government has established "good cause" to overcome the protection of the privilege. Second, I write because I believe that my colleagues' apparent concern for eliminating any taint from this ongoing investigation is misplaced.

I.

The government argues that "[its] need for the file results from [Capano's] refusal to testify before the grand jury and speak with investigators. The Government attempted to secure [Capano's] testimony, but its efforts failed." Appellant's Br. at 23. This amounts to nothing more than an assertion that failure to waive the privilege against self-incrimination under the Fifth Amendment gives the government the right to obtain information that would otherwise be protected as work product because it allows the government to establish the "good cause" needed to defeat that privilege. Surely, one need not waive the protections embedded in the Fifth Amendment in order to preserve a work product privilege.

We have historically been quite reluctant to find the good cause needed to overcome the protections of the work product doctrine. See In re Grand Jury, 633 F.2d 282 (3d Cir. 1980); United States v. Armerada Hess Corp., 619 F.2d 980 (3d Cir. 1985); and In re Grand Jury Investigation, 599 F.2d 1224 (3d Cir. 1979). We should not be reluctant to reject the government's claim of "good cause" insofar as it is based upon the argument that assertion of a constitutional right defeats the work product privilege.

II.

My colleagues note that "if the district court countenanced Capano's delay in judicially asserting his privilege and then upheld his claim of privilege, the grand jury's use of the seized file potentially could have tainted its investigation." Maj. Op. at 8. This may well be true, but is

12

irrelevant. The government risked tainting the investigation when it decided to proceed in the manner that it did. The circumstances here are unique. There is no reason that has been pointed out to this court why the government could not have sought to have Saul Ewing secure the Capano file, and then notified Capano of the government's intent to subpoena it. The district court could then have decided the motion to quash that Capano would most certainly have filed, and there would have been no possibility of taint prior to an adjudication of the privilege. The government was obviously aware of the problems it was creating by seizing the documents and setting up a "Chinese wall" in an attempt to insulate them. Because the Government chose that tactic, we ought not to allow a concern for any taint that the seizure may have created to affect our analysis of the claim of privilege. "The ultimate aim [of the work product privilege doctrine] is to promote the proper administration of justice." In re Grand Jury Proceedings, 604 F.2d 798, 802 (3d. Cir. 1979). That objective is not well served if we allow a possible taint that the government itself created to influence our inquiry.[1]

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

_____

1. There is no suggestion that Capano deliberately delayed filing a motion to secure an advantage. Where a defendant or target does that, I agree that consideration of taint may be appropriate.

13