Liza K. **BOWLES**, Plaintiff,

v.

**NATIONAL ASSOCIATION OF HOME BUILDERS, et al., Defendants.**

Civ.A. No. 02–2257(JDB).

United States District Court, District of Columbia.

Sept. 30, 2004.

Alan Robert Kabat, Debra S. Katz, Bernabei & Katz, PLLC, Daniel B. Edelman, Yablonski, Both & Edelman, Washington, DC, for Plaintiff.

Allen S. Rugg, Stephen R. Smith, Anie Elizabeth Wulkan, Powell Goldstein Frazer & Murphy, Washington, DC, for Defendants.

### MEMORANDUM OPINION

BATES, District Judge.

Liza K. Bowles ("plaintiff") brings this action against the National Association of Home Builders ("NAHB") and three officers of the company (collectively, "defendants"), relating to her termination as president of the National Association of Home Builders Research Center ("NAHBRC"), a wholly owned subsidiary of NAHB. Presently before the Court are plaintiff's motion to compel the production of documents by NAHB and defendants' cross-motion for the return of privileged documents in the possession of plaintiff. Plaintiff claims that NAHB has waived its attorney-client and work product privileges by disclosing several privileged documents to her while she was president of NAHBRC, and by failing to take reasonable measures to recover those documents from plaintiff upon her termination from employment. NAHB argues that plaintiff did not have the right to take the documents with her upon leaving the company, and therefore seeks the return of the documents.

For the reasons that follow, this Court concludes that NAHB has waived its attorney-client and work product privileges as to

all documents of the same subject matter as the privileged documents that NAHB gave to plaintiff when she was president and has since allowed plaintiff to possess. This Court further concludes that NAHB has not identified in its papers any legal right, in contract or otherwise, to the documents. Thus, plaintiff's motion to compel is granted and defendants' motion for the return of documents is denied. The ongoing briefing of dispositive motions is stayed until further notice. Plaintiff shall file papers not to exceed 10 pages in length on the scope of the subject matter waiver by not later than October 22, 2004; NAHB shall file responsive papers not to exceed 10 pages by not later than November 12, 2004; and plaintiff shall file any reply papers not to exceed 4 pages by not later than November 24, 2004.

### BACKGROUND

Plaintiff was employed by the NAHBRC, a wholly owned subsidiary of defendant NAHB, from May 1983 through October 2002. She was president of the NAHBRC from 1992 until the date of her termination. From 1983 to 2001, plaintiff was employed pursuant to a series of letter agreements. Beginning in 2002, however, the terms of her employment were governed by a formal employment agreement. The agreement has a significant severance payment provision, which lies at the heart of plaintiff's claims in this action, but it has no language expressly relating to the retention of documents upon the termination of the employee.[1] *See* Def. Rep. Ex. 1.

In early 2001, NAHB began negotiating with NAHBRC a License Agreement that would for the first time require NAHBRC to pay NAHB royalties for the use of its own name. NAHB explains that it pursued the agreement to lessen the tax consequences of NAHBRC's profits. NAHB consulted its attorneys, its accountants, and a consulting firm, all of whom either recommended a roy-

---

1. The same is true for NAHBRC's three Vice Presidents, David Dacquisto, Mark Nowak, and Larry Zarker. They all signed agreements in 2002 that guaranteed them large severance packages but did not place any explicit restrictions on their ability to take documents with them when they left the company.

alty agreement of this sort or assured NAHB that it was legal.

Plaintiff, on the other hand, fiercely objected to the proposed agreement, as did the three vice presidents of NAHBRC. Plaintiff discussed the issue with NAHBRC's own outside counsel,[2] who advised her that the IRS would most likely view the License Agreement as a fraudulent attempt to evade taxes. She also made her views known to NAHB on numerous occasions. As they debated and negotiated the License Agreement, NAHB shared with NAHBRC (and therefore with plaintiff, in her capacity as president of NAHBRC) several documents that were created by its outside and in-house counsel and that reflect their opinions of the legality of various drafts of the Agreement. The dispute between NAHB and the officers of NAHBRC grew so heated that the parties began to contemplate at least the possibility of litigation. *See, e.g.,* Def. Ex. 8, at 5 ("However, once the Parent begins to litigate, the outcome could go either way."). NAHB even appears to have sought advice from its counsel at one point regarding the removal of members of NAHBRC's Board of Directors. *See* Pl.Ex. 1, at 20.

NAHB's position on the Licensing Agreement won the day. On September 9, 2002, over plaintiff's continuing objection, the NAHBRC's Board of Directors ("the Board") approved the License Agreement. When plaintiff refused to sign the Agreement, the Board terminated her as well as NAHBRC's three vice presidents, and awarded them large severance payments consistent with their employment agreements. Two days later, however, the Board rescinded their terminations and stopped payment on their severance checks.

A lengthy series of correspondence followed. In a letter dated September 23, 2002, plaintiff's counsel informed NAHBRC's counsel that plaintiff did not intend to return to NAHBRC, that she expected payment on her severance check, and most relevant for present purposes, that she "has certain documents in connection with her employment as President of the Research Center." The letter continues on that plaintiff's counsel has "asked Ms. Bowles to return those documents to your firm but we will retain copies so that we can advise her with regard to her rights and obligations." Def. Ex. 1.

On October 7, 2002, NAHBRC's counsel[3] wrote in response saying, among other things, that "the Research Center demands the immediate return of all its documents and other property that Ms. Bowles may have in her possession." Def. Ex. 2. Plaintiff's counsel replied on October 30, 2002, that "[a]ny documents or other items of property of the Center that have remained in Ms. Bowles' possession or under her control are presently being returned to the Center." Def. Ex. 3. However, on November 4, 2002, plaintiff's counsel wrote to change its position: "Upon further research, we have concluded that Liza Bowles has a legal right to retain copies of documents that were provided to her or prepared by her in her capacity as president of the NAHB Research Center. Accordingly, I am retaining these documents, but am providing you with copies, which we have bate stamped LB 0001 to LB 0706." Def. Ex. 4. Plaintiff's counsel included copies of the documents with the letter.

NAHB's counsel replied at length in a firmly-worded letter dated November 8, 2002:

> These documents that Ms. Bowles has retained are corporate documents that belong solely to the Research Center. Further, many of these documents are privileged and confidential and are protected by the attorney-client and work product privileges. Ms. Bowles, as part of the 'control group' at the Research Center, was provided copies of these documents solely to assist her in performing her job as the President of the Research

---

2. NAHBRC was represented by Ballard Spahr Andrews & Ingersoll LLP ("Ballard Spahr") during this period. NAHB was represented by Powell Goldstein Frazer & Murphy LLP ("Powell Goldstein").

3. The law firm writing this letter and all ensuing letters on behalf of NAHBRC was Powell Goldstein, the same firm that represented NAHB during the negotiations over the Licensing Agreement and that has represented NAHB in this litigation.

Center. Ms. Bowles has been terminated and no longer has a need for or right to these corporate documents. Accordingly, we insist that Ms. Bowles return the original documents and any other copies that have been made to the Research Center.

Def. Ex. 5.

Plaintiff's counsel responded on November 11, 2002, saying "[w]e find that whether a former employee is required to return documents provided in connection with employment is a question of contract." The letter cites to case law, and then concludes: "There is no requirement in Ms. Bowles' Executive Employment Agreement that she return documents. If there is any other contractual provision that calls for her to return documents, we would appreciate your bringing it to our attention." Pl.Ex. 9. NAHBRC's counsel never replied to this letter, and the issue of the retained documents laid dormant for more than a year.

Meanwhile, on November 15, 2002, plaintiff filed her Complaint in this Court against NAHB and three of its officers (but not against NAHBRC).[4] The Complaint draws upon several of the privileged documents retained by plaintiff after leaving NAHBRC. Ten months later, on September 24, 2003, plaintiff issued requests for admissions that attached several of the retained documents and asked defendants to admit to their genuineness. On October 8, 2003, plaintiff served defendants with her initial disclosures under Fed.R.Civ.P. 26(a)(1), in which she included the retained documents as material potentially relevant to the matters at issue in this litigation.

NAHB's counsel wrote to plaintiff's counsel on November 19, 2003, noting that upon review

of the documents that you produced on behalf of Liza Bowles in response to Defendant National Association of Home Builders of America's ("NAHB") First Set of Requests for Production of Documents ..., NAHB discovered that Ms. Bowles possesses a series of privileged e-mails between Joe Barney and counsel for NAHB. *See* Bates Numbers LB 0176–77. There is no indication of how Ms. Bowles came into possession of these e-mails. NAHB seeks return of all copies of this series of e-mails. Moreover, NAHB objects to Ms. Bowles' use of any of these e-mails and her possession of these e-mails does not constitute a waiver of the NAHB's attorney-client privilege.

Pl.Ex. 6. That same day, NAHB's counsel wrote to plaintiff's counsel asserting privilege in, and demanding the return of, seven additional documents that it had discovered in plaintiff's production of documents. *See* Pl. Ex. 5. All but one of the documents cited in these letters are within the Bates range of the documents that plaintiff more than a year earlier had informed NAHBRC were in her possession.[5]

On December 22, 2003, plaintiff's counsel wrote to counsel for NAHB and NAHBRC that she was enclosing a draft motion and supporting memorandum seeking a determination from the Court that NAHB and NAHBRC had waived the attorney-client privilege as to the "innumerable documents we have been discussing in our past correspondence and with respect to *all documents pertaining to the same subject matter.*" Pl. Ex. 2. NAHB and NAHBRC's counsel replied on January 12, 2004, that "NAHBRC has agreed to waive the attorney-client privilege and work product privilege with respect to the issues you identified prior to Septem-

---

4. Plaintiff's employment agreement requires her to submit any disagreement with the NAHBRC to binding arbitration. *See* Def. Rep. Ex. 1, at 5. Therefore, in November 2002 plaintiff filed an arbitration demand against NAHBRC, but it was rejected by the American Arbitration Association ("AAA") because she failed to pay the proper filing fee. On January 3, 2003, she tried bringing a claim against NAHBRC in the Circuit Court for Prince George's County, Maryland, but that Court promptly ordered her to submit to binding arbitration. Finally, she simply abandoned her

claims against NAHBRC. The Court is not aware of any claim by plaintiff against NAHBRC that is presently pending in any tribunal.

5. In response to a third party subpoena, former NAHBRC Vice President David Dacquisto produced to NAHB many of the documents that are listed on NAHB's privilege log, but NAHB has not taken any legal steps to reclaim these documents from Dacquisto either. *See* Pl.Ex. 10.

ber 9, 2002. NAHB has not agreed to waive either the attorney-client privilege or work product doctrine." Def. Ex. 6.

On January 22, 2004, NAHBRC produced 459 pages of documents for which it had previously asserted privilege.[6] Nonetheless, according to the privilege log filed with the parties' papers, NAHB has independently asserted attorney-client privilege or attorney work product protection for more than 200 documents that are responsive to plaintiff's first request for the production of documents. *See* Pl.Ex. 1. NAHB and NAHBRC have withheld these documents from plaintiff in response to plaintiff's request for the production of documents, as well as to the dozens of third-party subpoenas that plaintiff has issued to various NAHB and NAHBRC employees, accountants, and lawyers.

Plaintiff has filed a motion to compel NAHB to produce all documents for which it has asserted privilege that relate to the same subject matter as the privileged documents that she retained upon her termination from NAHBRC. NAHB and the other defendants have filed a cross-motion for the return of the very documents that plaintiff retained. Those competing motions have been fully briefed by the parties.

## ANALYSIS

Although the two motions before the Court are related, the Court will address them separately. For the reasons set out below, the Court will grant plaintiff's motion to compel, and deny defendant's motion for the return of documents.

## I. Plaintiff's Motion to Compel

Plaintiff's motion to compel is premised on two arguments. First, plaintiff claims that NAHB has waived its attorney-client and work product privileges in the documents that plaintiff retained upon leaving the company, either by giving the documents to plaintiff in the first place, or by failing to take reasonable steps to recover the documents and protect any privilege in them.

Second, plaintiff asserts that the waiver of any privilege in those particular documents leads to a subject matter waiver as to all related documents. The Court agrees with both components of plaintiff's analysis, although not for all of the reasons that plaintiff offers.

### A. Waiver of Privilege

Plaintiff contends that NAHB waived any privilege in the documents in two respects: by disclosing them to her in her capacity as president of NAHBRC and by knowingly allowing her to retain the documents for more than a year after her termination without taking any legal action to recover them. The Court will address these arguments in turn.

### 1. Waiver by disclosure to NAHBRC

■ The D.C. Circuit has held that "any voluntary disclosure by the client to a third party breaches the confidentiality of the attorney-client relationship and therefore waives the privilege." *In re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir.1982). Plaintiff relies on this language to argue that NAHB has waived any privilege in documents that plaintiff took with her when she left the company, as well as any documents of the same subject matter, because NAHB gave the documents to NAHBRC while the two parties were adverse during negotiations over the License Agreement. Pl. Mem. at 8–9. NAHB replies that either NAHB and NAHBRC had a "common interest" in negotiating and avoiding potential litigation with the IRS over the Licensing Agreement, or NAHB and NAHBRC were adverse over the Licensing Agreement, but were exchanging documents in an attempt to settle their dispute. Either way, NAHB argues, the law provides that the exchange of documents does not lead to subject matter waiver. Def. Mem. in Opp'n at 6–13.

The Court concludes that NAHB and NAHBRC were adverse at the time of the negotiations over the Licensing Agreement. The president (plaintiff) and the three vice

---

6. The parties do not say, but the Court assumes that there is no overlap between the 459 pages of documents that NAHBRC disclosed and the more than 200 documents that are listed on NAHB's privilege log.

presidents of NAHBRC strongly opposed the proposed Licensing Agreement, and consistently made that view known to officials at NAHB; indeed, NAHBRC hired separate counsel from NAHB for purposes of the dispute over the Licensing Agreement, and have reverted to joint representation only after the Licensing Agreement was signed. Disagreement over the issue had led the parties to anticipate at least the possibility of litigation between them over the issue, and NAHB apparently sought advice from its counsel during this period on how to remove board members of NAHBRC. Plaintiff and the three vice presidents of the company ultimately were terminated from NAHBRC over the issue. Each of these facts weighs heavily in favor of the conclusion that the parties were adverse at the time in question, and did not share any common interest in the negotiations. *See, e.g., In re United Mine Workers of Am. Employee Benefit Plans Litig.,* 159 F.R.D. 307, 313 (D.D.C.1994) (finding that parties did "not always share common interests" and their "interests diverged" for the period of time when they disagreed over the legitimacy of the contractual provisions at issue in the case); *Int'l Ins. Co. v. Peabody Intern. Corp.,* 1988 WL 58611, at *3 (N.D.Ill.) ("A number of cases indicate that separate counsel is a significant index of the fundamental question of whether the parties were adverse").[7]

The parties do not seem to dispute that, insofar as NAHB and NAHBRC were adverse over the License Agreement, NAHB gave the documents to NAHBRC in an effort to settle the dispute. However, they draw different legal conclusions from this fact. Relying on broad statements of D.C. Circuit law, plaintiff claims that the voluntary disclosure of materials in settlement negotiations is an instance of a party revealing "part of a

privileged communication in order to gain an advantage in litigation" and therefore constitutes a broad subject matter waiver of the materials. *In re Sealed Case,* 676 F.2d at 818. NAHB counters by citing some of the many district court cases squarely holding that in order to give full encouragement to the negotiation of disputes, the disclosure of documents in settlement negotiations constitutes a waiver of any privilege in those specific documents, but does not necessarily give rise to a broader subject matter waiver. *See, e.g., AMCA Int'l Corp. v. Phipard,* 107 F.R.D. 39, 43 (D.Mass.1985); *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26, 45 (D.Md. 1974); *Am. Optical Corp. v. Medtronic, Inc.,* 56 F.R.D. 426, 431–32 (D.Mass.1972).[8]

The waiver of privilege in documents disclosed during settlement negotiations is an issue of first impression in this Circuit. *See, e.g., United States v. Martin Marietta,* 886 F.Supp. 1243 (D.Md.1995) (noting the absence of case law on the issue). The Fourth Circuit held several years ago that at least in cases where a party made an "express assurance of completeness" in a disclosure of documents during settlement negotiations in a criminal investigation, there is a subject matter waiver. *Martin Marietta Corp. v. Pollard,* 856 F.2d 619, 624 (4th Cir.1988). Further, the D.C. Circuit has found subject matter waiver in a case involving the selective disclosure of documents as part of the SEC's "voluntary disclosure" program, which bears at least some similarity to conventional settlement negotiations (although there as well the defendant pledged that it had turned over all relevant documents to the SEC). *In re Sealed Case,* 676 F.2d at 800. On the other hand, "[s]ettlement discussions and settlement decisions occupy a unique and protected place in our judicial system,"

---

**7.** This is not to say that privileged documents may not be exchanged between a parent and a subsidiary. However, the cases that have discussed such communications are careful to note that the privilege is only preserved when the parent and the subsidiary have a strong identity of interests. *See, e.g., United States v. AT & T,* 86 F.R.D. 603, 616 (D.D.C.1979) (requiring a "substantial identity of legal interest" between parent and subsidiary); *Roberts v. Carrier Corp.,* 107 F.R.D. 678, 687–88 (N.D.Ind.1985) (requiring an "identical, and not merely similar, legal inter-

est"). For the reasons set out in the text, that identity of interest was absent here during the time period at issue.

**8.** This issue of the waiver of attorney-client or work product privilege by disclosing materials during settlement negotiations is independent from the *evidentiary* rule regarding the use of evidence of a compromise or offer of compromise to prove liability for or invalidity of a claim. *See* Fed.R.Evid. 408.

*Childers v. Slater,* 1998 WL 429849, at *6 (D.D.C.), and there is at least a colorable argument that the articulation of legal positions and the disclosure of privileged documents in settlement negotiations does not always reflect the kind of "tactical" use of privilege materials "in litigation" that animates the subject matter waiver doctrine, *see AMCA Intern. Corp.,* 107 F.R.D. at 43. Likewise, there is a strong policy argument that requiring subject matter waiver in these circumstances would place an undesirable chill on the voluntary settlement of civil litigation.

The Court finds it unnecessary to resolve this open issue at this time. Even if there were no waiver of privilege due to the disclosure of documents during settlement negotiations, NAHB has nonetheless waived its privileges in the documents, and in all documents of the same subject matter, by failing to take reasonable steps to recover the documents and preserve any privilege once it was aware they were in the hands of a party opponent. The Court now turns to a discussion of this issue.

### 2. Waiver by failure to recover the documents

■ The D.C. Circuit follows a "strict rule on waiver of privileges." *SEC v. Lavin,* 111 F.3d 921, 929 (D.C.Cir.1997). A client wishing to preserve the privilege "must treat the confidentiality of attorney-client communications like jewels—if not crown jewels." *In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir. 1989). Accordingly, the "confidentiality of communications covered by a privilege must be jealously guarded by the holder of the privilege lest it be waived." *Lavin,* 111 F.3d at 929 (quoting *In re Sealed Case,* 877 F.2d at 980). The holder of the privilege "must zealously protect the privileged materials, taking all reasonable steps to prevent their disclosure." *Id.*

The question whether a client has taken all reasonable steps to protect any privilege in its documents usually arises in the context of "inadvertent" disclosures (where the holder

of the privilege is in possession of the materials and fails to take adequate precautions to maintain their confidentiality) or "involuntary" disclosures (where a third party over whom the holder of the privilege has no control is in possession of the materials and discloses them). *See Lavin,* 111 F.3d at 929. The circumstances in this case do not fit neatly into either category: the holder of the privilege here voluntarily gave the documents to plaintiff in her capacity as president of NAHBRC; she retained the documents upon leaving the company; and she is now a party opponent in litigation against the holder of the privilege. Nevertheless, the inadvertent and involuntary disclosure cases address the same issues at the core of this case: the measures a party must take to prevent the disclosure of privileged documents and to recover privileged documents once they are disclosed. Therefore, the Court looks to these cases in the first instance for guidance in resolving the present dispute.

■ Courts have consistently held that, in cases of involuntary disclosure, "waiver occurs only when the holder has failed to take reasonable steps to reclaim the protected material." *Lavin,* 111 F.3d at 930; *see also In re Grand Jury (Impounded),* 138 F.3d 978, 981 (3d Cir.1998) ("In determining whether a party has waived the privilege through an inadvertent or involuntary disclosure, courts consider, among other factors, the steps taken by a party to remedy the disclosure and any delay in doing so."); *United States v. de la Jara,* 973 F.2d 746, 749 (9th Cir.1992) ("When the disclosure was involuntary, we will find the privilege preserved if the privilege holder has made efforts 'reasonably designed' to protect and preserve the privilege."). The issue here is whether NAHB's assertion of privilege in correspondence with plaintiff and in response to discovery requests, even though it failed to take any legal action to assert its privilege or otherwise to recover the documents for more than a year after plaintiff informed NAHB that she possessed the documents, constitutes "reasonable steps to reclaim the protected material." [9]

---

9. Plaintiff informed NAHB for the first time that she possessed the documents on September 23, 2002. She sent NAHB copies of the documents on November 4, 2002. She filed this Complaint

The line of cases involving involuntary disclosures strongly indicates that the answer is no. The case closest to this one is the Third Circuit decision in *In re Grand Jury (Impounded)*. There, the suspect in a criminal investigation wrote a time-line of events at the behest of his lawyer and then placed the documents on a bookshelf in an adjoining office at the suspect's firm. The federal government seized the documents on November 4, 1996. Upon learning of the seizure, the suspect's lawyer immediately wrote to the government asserting privilege. The government wrote back on November 26, 1996, rejecting the claim of privilege. On January 22, 1997, the suspect again asserted privilege and requested the return of the documents. On February 25, 1997, the government rejected the request again. During this period, the suspect's counsel and the government had at least two (unfruitful) phone conversations about the suspect's claim of privilege as well. Finally, on March 14, 1997, approximately four months after the suspect discovered that the documents had been seized, he filed a motion in district court seeking an order compelling the government to return the file. *See* 138 F.3d at 979–80.

The district court denied the motion, and the Third Circuit affirmed. That court firmly rejected the suspect's argument that his correspondence with counsel preserved the privilege:

> [A] reasonable person would not only inform his or her adversary of the breach of the privilege, but also would seek a judicial determination of the controversy if his or her adversary took an opposing stance. Merely asserting the privilege to an adversary is not sufficient to protect the privilege in these circumstances inasmuch as the adversary has possession of the materials claimed to be privileged and thus can make use of them.

*Id.* at 982. The court noted that "the party asserting the privilege must move expeditiously for relief particularly where, as here, the party asserting the privilege does not even claim that he had reason to believe that the adversarial party was not making use of the work product." *Id.* The court concluded that "we are satisfied that Capano acted unreasonably in waiting nearly four months to seek a judicial vindication of his assertion of the privilege." *Id.*

Here, even as it wrote letters to plaintiff raising a privilege, NAHB waited fifteen months after discovering that plaintiff had the documents before it sought judicial vindication of its claim of privilege and recovery of the documents. NAHB makes no claim that it did not know that plaintiff was using the documents against it. Indeed, NAHB and plaintiff have been opposing parties in the present litigation for almost the entire time that NAHB has known plaintiff possessed the documents, and in the course of the litigation plaintiff has used the privileged documents in her pleadings, her requests for admissions, and her initial disclosures.

The only action NAHB needed to take was to file a motion in this existing litigation to recover the documents or otherwise assert its privilege. The failure to do so for more than a year does not reflect the "zealous" treatment of the confidentiality of the documents as "crown jewels" required under the law, and is clearly deficient under the analysis of *In re Grand Jury*. Other courts have reached a similar result. *See, e.g., de la Jara*, 973 F.2d at 750 (defendant waived privilege where he did "nothing to recover the letter or protect its confidentiality during the six month interlude between its seizure and introduction into evidence").

NAHB argues that the D.C. Circuit's decision in *SEC v. Lavin* requires a contrary result. 111 F.3d at 921. In *Lavin*, the investment bank where defendant worked (Bankers Trust) taped conversations between defendant and his wife. In early September 1994, Lavin found out that the tapes existed. In mid-November, Bankers Trust notified Lavin that it had sent copies of the tapes to the Federal Reserve Board in response to a request made pursuant to the Board's examination powers. Lavin immediately alerted Bankers Trust that he was asserting his marital communications privilege. Lavin

on November 15, 2002. NAHB ceased its correspondence asserting privilege in November 2002 and did not file its cross-motion for the return of the documents until February 20, 2004.

also asked Bankers Trust to preserve the privilege on its behalf to the Federal Reserve, and any others in the future who might request the tapes. Lavin finally reached an agreement with Bankers Trust where it would provide him with notice and an opportunity to seek relief if it made any further disclosures. See id. at 923. In January 1995, the SEC discovered that Bankers Trust had withheld the tapes from them in response to a subpoena. Meanwhile, Lavin had successfully intervened to block the disclosure of the tapes to Procter & Gamble in a separate civil suit involving Banker's Trust. See id. at 924–25. On November 9, 1995, after months of discovery, the SEC applied to the district court for an order enforcing its subpoena over Lavin's claim of privilege. See id. at 923–24.

The D.C. Circuit refused to enforce the subpoena, holding that Lavin had preserved his marital privilege in the tapes. The court reasoned that "the Lavins took reasonable action to protect the confidentiality of the conversations by asserting the privilege as soon as there was a threat of further disclosure to third parties." Id. at 932. Upon learning of the disclosure to the Federal Reserve Board, the Lavins immediately asserted the privilege against Bankers Trust and the Board, secured an agreement with Bankers Trust to prevent the further disclosure of the tapes, and intervened in any litigation to prevent the disclosure of the tapes. See id. at 931. "Under these circumstances, it was sufficient for the Lavins to assert the privilege as soon as they were notified of the requests for the tapes by the Federal Reserve, and to assert the privilege here and in other litigation." Id. The court concluded that Lavin was not obliged to "in-stitute other legal measures absent a concrete threat of further disclosure."[10] Id.

The crucial distinction between Lavin and the present case is that the initial disclosure of the documents in Lavin was to a third party, not to an adversary. Lavin had reached an agreement with Bankers Trust to prevent further disclosure of the documents, took numerous steps to ensure that the SEC—a potential adversary—would not be able to obtain the documents, and intervened in litigation where parties sought further disclosure of the documents. The D.C. Circuit found these steps sufficient, while cautioning that Lavin had a continuing obligation to "institute ... legal measures" both "here and in other litigation" when there was a "concrete threat of further disclosure." Id. at 931–32.

By contrast, NAHB knew that an existing adversary already had possession of the documents.[11] Indeed, NAHB was on notice that plaintiff was using the documents against her in these very proceedings.[12] The harm to NAHB from this possession was immediate. Taking steps to prevent the "further disclosure" of the documents would do no good here; the disclosure had already breached the confidentiality in the documents in every way that mattered, insofar as an opposing party had possession of the documents and was using them in litigation. At this point, NAHB had a clear obligation to "move expeditiously for relief" by taking "legal measures" to preserve the privilege in the documents. Lavin, 111 F.3d at 931; In re Grand Jury, 138 F.3d at 982; see also de la Jara, 973 F.2d at 749 (party must "immediately attempt[ ] to recover the" documents). NAHB waited well over a year after it knew

10. Although involving a marital communications privilege, Lavin drew heavily on case law and treatises regarding the attorney-client privilege, and noted the strong parallels between the marital communication and the attorney communication privileges. See, e.g., id. at 929.

11. NAHB also knew that one of the former vice presidents of NAHBRC had several of the privileged documents in his possession, and yet took no steps to retrieve the documents from him either.

12. As of November 2002 (when plaintiff filed her complaint that drew on the documents), and at least as of September 2003 (when plaintiff filed her requests for admission that attached some of the documents), NAHB should have known that plaintiff was using the documents against it. Nevertheless, NAHB waited more than fifteen months from the date of the Complaint, and five months from the date of the requests for admission, to make any legal effort to reclaim the documents through this litigation (when, in response to plaintiff's motion to compel, it filed its cross-motion for the return of documents in February 2004).

that plaintiff had possession of the documents to file its present cross-motion to recover them, far exceeding the six month (in *de la Jara*) and four month (in *In re Grand Jury*) delays that were found to waive the privilege in earlier cases. Thus, under this line of cases, NAHB waived its privilege in the documents.

This conclusion is in accord with cases that have specifically addressed a company's claim of privilege in documents that an employee has taken when leaving a company. In one such case, after discovering that a consultant had taken several documents with him when his consultation agreement with the plaintiff expired, the plaintiff wrote several times demanding the return of the documents, to no avail: the consultant either failed to reply to the letters or refused to return the documents. *IMC Chemicals, Inc. v. Niro Inc.*, 2000 WL 1466495, at *3 (D.Kan.). The plaintiff did not take any legal action to recover the documents. A year later, the defendant in the litigation took the consultant's deposition, at which the consultant produced two of the documents that he had retained. The plaintiff's counsel objected on the basis of privilege, and withdrew the documents from discovery. The defendant then moved to compel the plaintiff to produce the documents. *See id.* at *4–*5.

The court held that the plaintiff had waived the attorney-client privilege in the documents by failing to move expeditiously to recover the documents. The court noted that the employment agreement in the case—although it emphasized that all documents were the property of the company and required the surrender of any documents

obtained in the course of employment upon termination—did not apply to the documents at issue because they were obtained prior to the time that the consultant signed the agreement. *See id.* at *26. The court found "limited, if any, precautions taken by plaintiff to assure the confidentiality of the documents kept by [the consultant]." *Id.* at *27. Finally, the court emphasized that plaintiff took more than a year to take steps to re-obtain the documents: "Even were the Court to excuse the initial failure to protect the documents from being removed from plaintiff's premises, the Court can find no acceptable reason for plaintiff not taking more aggressive steps to reacquire the documents after it learned that [the consultant] still had them in late 1997." *Id.; see also In re Sealed Case,* 877 F.2d at 980 (suggesting that there might be "no waiver at all" of the attorney-client privilege where a party takes "all possible precautions" to prevent an inadvertent disclosure).

■ The facts in *IMC Chemicals* are very close to those here. Here, NAHB does not point to *any* measures it took to preserve the confidentiality of its documents while they were still in its possession.[13] For example, NAHB does not claim that it put the documents in a secure area, *Martin Marietta,* 886 F.Supp. at 1245–46, or that it stamped the documents "Confidential/Do Not Reproduce or Distribute," *Crabb v. KFC Nat'l Mgmt. Co.,* 952 F.2d 403, 1992 WL 1321, at *2 (6th Cir.1992). NAHB did not even take the simple precaution of placing a provision in its executive employment agreement requiring the surrender of any documents obtained in the course of employment.[14]

13. Those courts that have preserved the privilege in documents retained by a former employee have generally done so where there are at least some facts in the record to indicate that the employer had taken reasonable measures to prevent the disclosure of the document. *See, e.g., Martin Marietta,* 886 F.Supp. at 1245 (finding no waiver where employer required employees to sign statement certifying that they have returned all property, and maintained the documents in a secure building such that an employee's taking of the documents amounted to "outright theft"). NAHB has not introduced *any* facts that indicate it took reasonable precautions to protect the confidentiality of the documents. *United States v. Philip Morris Inc.,* 212 F.R.D. 421, 424 (D.D.C.

2002) (burden rests on the holder of the privilege to show that there has been no waiver).

14. The only passage in an agreement with plaintiff to which NAHB directs this Court's attention is Paragraph 2, which provides that the "Executive shall devote her entire productive time, ability and attention to the business of the Company and shall perform all duties in a professional, ethical and businesslike manner." Def. Rep. Ex. 1. Needless to say, this language does not compare to the explicit provisions in *IMC Chemicals, Martin Marietta,* and other cases prohibiting employees from taking documents with them at the conclusion of their employment.

Just as in *IMC Chemicals,* once it discovered that plaintiff had made away with the documents, NAHB claimed privilege in correspondence with plaintiff but waited a year to take any legal action to assert its rights in the documents. This passivity is incompatible with plaintiff's obligation to "jealously" protect any privilege in the documents. *Lavin,* 111 F.3d at 929. Other cases agree with this result. *See, e.g., Apex Mun. Fund v. N-Group Sec.,* 841 F.Supp. 1423, 1433 (S.D.Tex. 1993) (holding that "a one-year delay in taking any action to attempt to preserve the privilege" in documents retained and then disclosed by former employee waives the company's privilege in the documents).

The two lines of cases discussed above—those involving the inadvertent or involuntary disclosure of documents to a party opponent, and those involving the retention of documents by a former employee—converge on the same result: NAHB waived the attorney-client and work product privileges in documents that were retained by plaintiff after she was terminated, when NAHB waited more than a year to seek a judicial resolution of the privilege issue from the time it discovered she took the documents and from the time she commenced litigation against NAHB and began using the documents in the litigation.

The review of the case law above confirms that in many respects this is a fact-specific inquiry. This opinion should not be taken as articulating a broad rule of privilege waiver. Even so, the circumstances of this particular case leave little room for doubt that NAHB failed to meet its burden of "jealously guarding" the confidentiality of its privileged documents, and moving "expeditiously" to protect any privilege in its documents once it discovered that confidentiality has been lost. *See Lavin,* 111 F.3d at 929; *In re Grand Jury,*

138 F.3d at 981. Accordingly, the Court finds that NAHB has waived its attorney-client and work-product privileges in the documents at issue.[15]

## B. Subject Matter Waiver

■ As noted earlier, the D.C. Circuit applies a "strict rule on waiver of privileges." *Lavin,* 111 F.3d at 929. One consequence of this approach is that a waiver of the attorney-client privilege for a document is not confined to that document alone, but extends to all other documents involving the same subject matter as well. *See, e.g., In re Sealed Case,* 877 F.2d at 980 ("a waiver of the privilege in an attorney-client communication extends 'to all other communications relating to the same subject matter'") (quoting *In re Sealed Case,* 676 F.2d at 809).

■ This "implied waiver" or "subject matter waiver" rule arises out of the concern that a party will selectively disclose documents to obtain a tactical advantage. As the D.C. Circuit has explained:

> When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter because the privilege of secret consultation is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former.

*In re Sealed Case,* 676 F.2d at 818 (quotation omitted). Nevertheless, this broad waiver applies to deliberate and inadvertent disclosures alike, *In re Sealed Case,* 877 F.2d at 980, and NAHB does not contend that the rule is inapplicable to the materials in this case that are protected by the attorney-client privilege. Accordingly, the Court con-

---

**15.** There are important differences between the attorney-client privilege and the attorney work product, both of which are referred to herein as "privileges." One of the differences pertains to subject matter waiver and is discussed in Part II *infra.* However, for purposes of the principles that were discussed in this part of the opinion, the two privileges are similar, and are treated by courts as interchangeable. *See, e.g., In re Grand Jury,* 138 F.3d at 980 (finding waiver of attorney work product where suspect failed to take rea-

sonable steps to preserve privilege of inadvertently disclosed documents, while relying on attorney-client privilege cases); *de la Jara,* 973 F.2d at 749–50 (finding waiver of attorney-client privilege where defendant failed to take reasonable steps to recover involuntary disclosed document). Simply put, a party cannot disregard the confidentiality necessary for the assertion of either an attorney-client or an attorney-work product privilege for more than a year and expect either of them to survive.

cludes that the waiver of any attorney-client privilege in the documents shared with and retained by plaintiff extends to all other documents for which NAHB has claimed attorney-client privilege and that relate to the same subject matter.

■ This does not quite end the inquiry. NAHB argues that subject matter waiver does not apply to documents protected by attorney work product. Plaintiff disagrees. This legal issue is of more than just a passing interest in this case, because a majority of the documents as to which NAHB asserts privilege are documents for which it asserts only the protection of the attorney work product privilege (but not attorney-client privilege), or documents for which it asserts both attorney-work product and attorney-client privilege. Were the subject matter waiver rule applicable only to documents protected by the attorney-client privilege, then these two categories of documents would continue to be shielded from disclosure by the attorney-work product privilege.[16]

The D.C. Circuit in the first *In re Sealed Case*, even as it announced the subject matter waiver rule for documents protected by attorney-client privilege, explained that the "purposes of the work product privilege are more complex, and they are not inconsistent with selective disclosure—even in some circumstances to an adversary." 676 F.2d at 818. However, the court cautioned that "at some point acceptable tactics may degenerate into 'sharp practices' inimical to a healthy adversary system," and when that occurs, subject matter waiver of work product is acceptable. *Id.* The court went on to hold that certain factors in that case militated in favor of subject matter waiver, among them the defendant's express representation that it had turned over all of the relevant documents to the government (when in fact it had not). *See id.* at 821.

The district court in *In re United Mine Workers,* 159 F.R.D. 307 (D.D.C.1994), read *In re Sealed Case* as holding that a subject-

matter waiver should be applied in the attorney work product context only when such a broad waiver would be consistent with the purpose of attorney work product, which is to "promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." *Id.* at 312. The court held that, unlike in *In re Sealed Case,* the facts before it did not present a situation where the plaintiff was deliberately disclosing documents to gain a tactical litigation advantage. The court further noted that the "documents that have been disclosed are unhelpful to plaintiffs' position," and that "additional attorney work product ... would provide the defendants with a substantial strategic windfall." *Id.* The court therefore concluded that subject matter waiver would be "more likely to undermine the adversary system than to promote it," and accordingly declined to find a subject matter waiver of the attorney work product.

This court agrees with the treatment of subject-matter waiver for attorney work product in *In re United Mine Workers.* Unlike in *In re United Mine Workers,* however, the facts of this case lead the Court to conclude that subject matter waiver is appropriate. At the outset, subject matter waiver in this case would not disclose trial preparations as such, because the documents at issue pertain to negotiations and disagreements over the License Agreement that is the *topic* of the present litigation, not to either party's *litigation strategies* or *trial preparations* for the present litigation.[17] Therefore, the application of subject matter waiver in this case cannot be said to frustrate the purpose of the work product doctrine the way it does in cases where waiver would reveal the "fruits of an attorney's trial preparations" in active litigation. *Id.*

Further, one can assume that when NAHB sent documents to NAHBRC and plaintiff in an effort to persuade them to sign the Li-

---

16. This discussion does not apply to any of the documents that plaintiff took with her after being termination from NAHBRC. Those documents have already lost their privilege independent of any subject matter waiver for the reasons set out in Part I of this memorandum opinion.

17. Indeed, almost all of the documents for which NAHB has invoked privilege pre-date the present litigation. *See* Pl.Ex. 1.

cense Agreement, NAHB was only sending documents that supported the legality and advisability of the License Agreement, but withholding any documents (if they exist) that might suggest otherwise. Thus, this case is at least *closer* to the core concern of subject matter waiver—the partial release of documents to gain a tactical advantage—than most instances of inadvertent waiver, although the advantage sought was in negotiations between NAHB and NAHBRC, not in this litigation.

Finally, when plaintiff sent NAHB a draft of her motion to compel, the counsel who jointly represent both NAHB and NAHBRC in this litigation wrote her that NAHBRC had chosen to waive its attorney-client and work product privileges, although NAHB would continue to assert both privileges. *See* Pl.Ex. 3. NAHB explains now that "NAHBRC decided to waive its privileges so that its counsel could disclose in the instant lawsuit their advice as it was communicated to Ms. Bowles, then-president of the NAHBRC, with regard to the permissibility of the Agreement." Def. Mem. in Opp'n at 9 n. 9. NAHB has since produced 459 pages of documents to plaintiff that it had previously claimed were privileged. *See* Pl. Rep. at 2.

In essence, a subsidiary company is waiving a privilege also held by its parent company so that the subsidiary can make a point that it presumably believes will help the parent company in the present litigation (the subsidiary is not a party), all while the parent company continues to invoke the privilege and both are jointly represented by the same counsel. Plaintiff addressed this issue only in passing in its papers, and did not cite any law for the proposition that this circumstance constitutes a waiver as to some or all of the documents. The Court therefore declines in this instance to resolve whether this circumstance presents an independent basis for waiver of any documents.

Nevertheless, the Court finds that this conduct has a strong bearing on whether this is a case where subject matter waiver of attorney work product would be appropriate. Whatever else may be true about NAHBRC's waiver of its privilege, it is apparent that this is not a situation where subject matter waiver is inappropriate because the "documents that have been disclosed are unhelpful to plaintiffs' position," *In re United Mine Workers,* 159 F.R.D. at 312—since NAHB admits that NAHBRC has waived the privilege so that it could establish a particular point in this litigation. Nor is this a case where the "additional attorney work product ... would provide the defendants with a substantial strategic windfall," *id.*—since if anything, subject matter waiver of attorney work product will correct for NAHB's "strategic windfall" that followed from NAHBRC's waiver of privilege.

Upon consideration of all of these factors, the Court concludes that this is a case where subject matter waiver of opinion work product is appropriate. Such a waiver should not frustrate the purposes of the work product doctrine, and in fact is likely to promote the adversary system by ensuring that the evidence in the record will not reflect only one side or a part of privileged communications. Accordingly, the Court will allow the subject matter waiver of attorney work product documents in this case.

It is worth noting that plaintiff is not without blame here. Although the consequences of plaintiff's decision to take company documents with her after her termination were favorable in the instant dispute, the adversary process does not benefit from any rule that would encourage the sort of self-help undertaken by plaintiff here. Accordingly, the Court will use its discretion to define the subject matter waiver narrowly. *See In re United Mine Workers,* 159 F.R.D. at 308 (explaining that the factual context can warrant narrowing or expanding the scope of the subject matter waiver).

Ultimately, however, it falls to NAHB to protect the privilege in its documents in the first instance. At least according to the evidence in the record, NAHB failed to take any discernible steps to protect the confidentiality of the documents at the outset, and then failed for more than a year to take any legal measures to preserve its privileges in the documents once it discovered that they were in the open. A company that is this "careless with the confidentiality of its privileged communications" bears the risk of inadver-

tent and even involuntary disclosure and "thereby the danger that the 'waiver' will extend to all related matters, perhaps causing grave injury to the organization." *In re Sealed Case,* 877 F.2d at 979. NAHB can certainly take measures in the future to better protect and preserve its privileges.[18]

### C. Scope of the Subject Matter Waiver

The determination of the appropriate scope of a subject matter waiver can be a factually intensive inquiry. Due to the complexity of the legal issues discussed herein, the parties were unable to devote much attention in their papers to the scope of any subject matter waiver—that is, the proper definition of the "subject matter" of the privileged documents that were disclosed to plaintiff, and the documents that will lose their privilege as a result. Accordingly, the parties shall brief these issues further. Plaintiff shall file papers not to exceed 10 pages in length addressing the scope of the subject matter waiver by not later than October 22, 2004; NAHB shall file responsive papers not to exceed 10 pages by not later than November 12, 2004; and plaintiff shall file any reply papers not to exceed 4 pages by not later than November 24, 2004.

### II. Defendants' Cross–Motion for the Return of Privileged Documents

NAHB cross-moves for the return of all copies of the disputed documents retained by plaintiff and currently in her possession. However, NAHB does not cite a single contractual provision, tort, or existing privilege that would entitle it to the return of the documents.

Instead, NAHB relies almost exclusively on *Dyer v. William S. Bergman & Assocs., Inc.,* 657 A.2d 1132 (D.C.1995). However, in that case, the plaintiff's employment contract contained a restrictive covenant that prevented him from soliciting or accepting employment by any client of the defendant for more than a year. The employee nevertheless took documents from the company the day after he was terminated and after he assured a supervisor he would not do so, and then used the documents to steal away her former employer's principal customer. In those circumstances, the court called the taking of the documents a breach of the non-compete covenant and "borderline theft" and required the return of the documents. *Id.* at 1140.

Here, there was no non-compete clause in plaintiff's employment agreement,[19] and there is no claim that plaintiff returned to the company after she was terminated to take any documents. NAHB insists that plaintiff has stolen one of its clients since she left, but does not explain what contractual provision, tort, or statute this violates, or why it would warrant the return of the documents at issue.

There is no provision in plaintiff's contract requiring the return of any documents at the conclusion of her employment. NAHB does not cite any other legal basis compelling the return of the documents. Moreover, the Court has now concluded that they are no longer protected by any privilege. Accordingly, defendants' cross-motion for the return of documents is denied.

### CONCLUSION

For the reasons stated above, plaintiff's motion to compel is granted; and defendants' cross-motion for the return of documents is denied. Moreover, the briefing of dispositive motions is stayed pending briefing on the scope of subject matter waiver.

A separate order will be issued.

---

18. NAHB argues that any documents in "draft" form are not discoverable under the rule of *Holland v. Island Creek Corp.,* 885 F.Supp. 4, 8 (D.D.C.1995). However, *Holland* merely stands for the proposition that the disclosure of one draft of a document does not necessary lead to the conclusion that the privilege for all drafts of the document is waived (under the logic that if the one lacks privilege, the others must as well). *Holland* is not a case involving subject matter waiver, and it does not purport to throw a blanket exception to subject matter waiver over "drafts" of documents.

19. Paragraph 2 of plaintiff's employment agreement, quoted in footnote 14 *supra,* does not nearly suffice. The non-compete provision in *Dyer* explicitly prohibited the employee from soliciting any client of his former employer for a year. 657 A.2d at 1140. There is no such provision in the employment agreement here.

***ORDER***

Upon consideration of [22] plaintiff's motion to compel and [25] defendants' cross-motion for the return of documents, and the entire record in this case, it is for the reasons stated in the memorandum opinion issued on this date hereby ORDERED that

1. Plaintiff's motion to compel is GRANTED;

2. Defendants' cross-motion for the return of documents is DENIED;

3. The briefing of dispositive motions is STAYED; and

4. Plaintiff shall file papers not to exceed 10 pages in length on the scope of the subject matter waiver by not later than October 22, 2004; defendant NAHB shall file responsive papers not to exceed 10 pages by not later than November 12, 2004; and plaintiff shall file any reply papers not to exceed 4 pages by not later than November 24, 2004.